522 S.E.2d 912

**JAN–CARE AMBULANCE SERVICE, INC., and West Virginia EMS Coalition, Appellants,**

v.

**The PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Interstate Medical Transport, Inc., and Sophia Volunteer Fire and Ambulance Service, Inc., Appellees.**

No. 26005.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1999.

Decided Oct. 15, 1999.

---

**186**

John Philip Melick, Jackson & Kelly PLLC, Charleston, West Virginia, Attorney for the Appellants.

Richard M. Allen, Charleston, West Virginia, Attorney for Appellee, The Public Service Commission of West Virginia.

Thomas N. Hanna, Charleston, West Virginia, Attorney for Appellee, Interstate Medical Transport.

James D. Kauffelt, Kauffelt & Kauffelt, Charleston, West Virginia, Attorney for Amicus Curiae, West Virginia Medical Facilities Transport Providers Association.

Stephen D. Annand, Roberta F. Green, David J. Mincer, Shuman, Annand, Bailey, Wyant & Earles, Charleston, West Virginia, Attorneys for Amicus Curiae, Kanawha County Emergency Ambulance Authority.

David Schles, Phillip M. Stowers, Charleston, West Virginia, Attorneys for Amicus Curiae, West Virginia Emergency Medical Services Advisory Council, A State Agency.

Darrell V. McGraw, Jr., Attorney General, Stephen J. Small, Asst. Attorney General, Charleston, West Virginia, Attorneys for Amicus Curiae, West Virginia Department of Health and Human Resources.

DAVIS, Justice:

Appellants Jan–Care Ambulance Service, Inc. (hereinafter "Jan–Care") and the West Virginia EMS Coalition (hereinafter "the Coalition") appeal two orders of the Public Service Commission (hereinafter "the PSC"), which granted certificates of convenience and necessity, pursuant to W. Va.Code § 24A–2–5 (1980) (Repl.Vol.1999), authorizing Appellee Interstate Medical Transport, Inc., and Appellee Sophia Volunteer Fire and Ambulance Service, Inc, to provide transportation for certain persons to and from health-care facilities. Jan–Care and the Coalition argue that such transportation constitutes emergency medical services that must be regulated by

the Office of Emergency Medical Services as provided in W. Va.Code § 16–4C–1, *et seq.*, the Emergency Medical Services Act of 1996. We find that the PSC has jurisdiction to authorize common carriers to provide transportation to and from health-care facilities within the statutory limits explained in the body of this opinion. However, the PSC exceeded that jurisdiction with regard to the cases underlying the instant appeal.

### I.

### FACTUAL AND PROCEDURAL HISTORY

The particular facts pertaining to Appellee Interstate Medical Transport, Inc. (hereinafter "Interstate"), and Appellee Sophia Volunteer Fire and Ambulance Service, Inc. (hereinafter "Sophia"), are set forth separately below, beginning with Interstate.

#### A. Interstate

On January 5, 1998, Interstate submitted an application to the PSC requesting a certificate of convenience and necessity pursuant to W. Va.Code § 24A–2–5 (1980) (Repl.Vol. 1999). After some initial processing, the PSC interpreted the application as requesting that Interstate be authorized to

> operate as a common carrier by motor vehicle in the transportation of patients in specialized limousine service to and from physicians' offices, hospitals and other health-care facilities between points and places in Fayette and Raleigh Counties, on the one hand, and points and places in West Virginia, on the other hand.

Interstate concurred with the PSC's interpretation of Interstate's application. The PSC referred the matter to the Division of Administrative Law Judges for a decision. Thereafter, various procedural orders were issued by the Administrative Law Judge (hereinafter "ALJ") assigned to the case. These orders, in part, directed Interstate to publish notice of its application and scheduled a hearing on the application for June 3, 1998.

In response to Interstate's published notice, protests opposing the application were filed by Clarence R. Cottle, Beckley Limousine Service and Checker Cab Company.

Thereafter, Interstate amended its application to exclude trips that would both begin and end within either Raleigh or Fayette County.[1] In response to the amended application, all three protests were withdrawn and the hearing scheduled for June 3, 1998, was canceled by a procedural order issued by the ALJ on June 2, 1998.[2]

Also on June 2, nearly two months after the close of the protest period, Jan–Care and the Coalition filed a petition to intervene in this matter. In their petition, Jan–Care and the Coalition challenged the PSC's jurisdiction to grant authority to transport "patients." Jan–Care and the Coalition argued that because they raised primarily jurisdictional issues, their late-filed petition should be granted and a hearing scheduled. By recommended decision entered June 10, 1998, the ALJ opined that the motion to intervene should be denied as untimely. However, the ALJ recommended that Interstate's application be granted with an amendment intended to address the concerns of Jan–Care and the Coalition. Specifically, the ALJ suggested the word "patient" be changed to "passenger." Thus, the recommended decision granted Interstate the authority to

> operate as a common carrier by motor vehicle in the transportation of *passengers* in specialized limousine service to and from physicians' offices, hospitals and other health-care facilities between points and places in Fayette and Raleigh Counties, on the one hand, and points and places in West Virginia, on the other hand, excluding, however, all trips that would both

begin and end within either of the aforesaid counties.

(Emphasis added).

The PSC staff then filed a motion to intervene arguing that the ALJ erred by substituting the broader word "passengers" for the more narrow term "patients" in describing the authority granted to Interstate. Noting that the published version of the application requested authority to transport "patients," the PSC staff contended that "[s]ome carriers that might have protested an application to transport 'passengers' might not have protested an application to transport 'patients' only." Jan–Care and the Coalition also filed exceptions to the recommended decision, primarily asserting their previously expressed jurisdictional challenge.

By order entered September 22, 1998, the PSC granted the exceptions filed in response to the ALJ's recommended decision, granted the request of Jan–Care and the Coalition to intervene,[3] and remanded the case to the Division of Administrative Law Judges for further processing. In compliance with this order, the Chief ALJ conducted a hearing and received evidence from Interstate and from Jan–Care and the Coalition. Following the hearing, the Chief ALJ issued a detailed thirty-one page recommended decision. In that decision, the Chief ALJ first concluded that the PSC did have jurisdiction to grant the authority requested by Interstate. In this regard, the Chief ALJ noted that, notwithstanding the use of the word "patient" in connection with Interstate's request for a certificate of convenience and necessity, "the

---

1. Interstate's amended application was contingent upon the withdrawal of the filed protests.

2. The PSC is authorized to grant an unchallenged petition without conducting a hearing. W. Va.Code § 24A–2–5(a) (1980) (Repl.Vol.1999).

3. In granting the request to intervene submitted by Jan–Care and the Coalition, the PSC expressed that

> [i]t was ... within the ALJ's authority to recommend rejection of the late petition to intervene filed by Jan–Care and WVEMS. The ALJ correctly noted that timely protests permit parties to negotiate their differences in a timely manner, which the Commission encourages.
> However, the ALJ, on the one hand, rejected the late petition to intervene, then, on the other hand, attempted to address the concerns raised

in the late petition. Just as the ALJ had the authority to recommend rejecting the late petition to intervene, the ALJ also had the authority to recommend accepting the late petition to intervene....
> Jan–Care and WVEMS member [sic] provide emergency medical services and, in doing so, they transport patients, as defined by *W. Va. Code* § 16–4C–3(*o*). Jan–Care and WVEMS allege that the Commission does not have authority to grant certificates to common carriers to transport patients. This allegation is sufficient to demonstrate a legal interest in this proceeding. Moreover, the ALJ has attempted to grant Jan–Care and WVEMS some relief. It would be inappropriate for the Commission to fashion relief, yet exclude from the proceeding the parties who are presumed to benefit from that relief.

service proposed to be provided by [Interstate] is simply a specialized limousine service, much the same as the Commission has authorized for the transportation of railroad crews and other groups who require more regularly scheduled transportation than a taxi service might be able or willing to provide." The Chief ALJ further observed that:

[Interstate] schedules a transport upon being notified by a client of a doctor's appointment, an appointment for a dialysis treatment or a need to be transported to any other type of medical facility and, if the client is able to get in and out of [Interstate's] van on his or her own power and requires no medical treatment in route, [Interstate] provides the requested service. The [Interstate] van is not equipped with any medical equipment beyond a basic first aid kit[,] and there is no evidence in the record to indicate that [Interstate] has ever represented to any passenger or medical facility that it either has the capability or is willing to provide any sort of medical treatment to any of its clients.

Having found that the PSC had jurisdiction to grant Interstate the requested authority, the Chief ALJ proceeded to address and reject specific challenges to the grant of authority that had been raised by Jan–Care and the Coalition. Consequently, the Chief ALJ granted the certificate of convenience and necessity to Interstate authorizing it

[t]o operate as a common carrier by motor vehicle in the transportation of patients in specialized limousine service to and from physicians' offices, hospitals and other health-care facilities between points and places in Fayette and Raleigh Counties, on the one hand, and points and places in West Virginia, on the other hand, excluding, however, all trips that would both begin and end within either of the aforesaid counties.

Jan–Care and the Coalition filed exceptions to this recommended decision raising the same basic arguments they had pursued before the Chief ALJ. Thereafter, by order entered February 3, 1999, the PSC denied the exceptions and adopted the Chief ALJ's recommended decision as its final order.

### B. Sophia

The relevant facts relating to the application of Sophia are less involved. Sophia filed its application for a certificate of convenience and necessity on June 5, 1998. After initial processing and information gathering, the PSC interpreted the application as requesting that Sophia be authorized

to operate as a common carrier by motor vehicle in the transportation of passengers to and from the offices of physicians and other health care providers, between points and places in Raleigh County, on the one hand, and points and places in West Virginia, on the other hand.

Sophia concurred with the above language and was directed to publish notice of its application. The notice specified that all objections to the application must be tendered to the PSC within ten days after the publication. After the ten-day period for objections had expired, Jan–Care and the Coalition filed a petition to intervene, asserting that the PSC did not possess jurisdiction to grant the authority requested by Sophia.

The ALJ to whom Sophia's case had been referred observed that the authority requested by Sophia was "in all essentials, the same as the authority requested in *Interstate*." Due to this similarity, and because Jan–Care and the Coalition raised the same jurisdictional issue that had previously been addressed with regard to Interstate's application, the ALJ determined that the petitioners failed to provide a compelling reason to allow their late-filed petition.[4] There being no timely protests to Sophia's application, the ALJ entered a recommended decision grant-

---

4. Jan–Care and the Coalition were not permitted to raise their challenges to Sophia's application to the PSC due to the untimeliness of their attempt to intervene. As a general rule, this Court will not address nonjurisdictional issues that were not first addressed below. *See* Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 482 S.E.2d 218 (1996); Syl. pt. 3, *Voelker v. Frederick Bus. Properties Co.*, 195 W.Va. 246, 465 S.E.2d 246 (1995). However, the issue asserted by Jan–Care and the

Coalition is one of jurisdiction, which may be raised for the first time on appeal. *See* Syl. pt. 6, *State ex rel. Hammond v. Worrell*, 144 W.Va. 83, 106 S.E.2d 521 (1958) (" 'Lack of Jurisdiction may be raised for the first time in this [C]ourt, .... and may be taken notice of by this [C]ourt on its own motion.' [Syl. pt. 3,] *Charleston Apartments Corp. v. Appalachian Electric Power Co.*, 118 W.Va. 694[, 192 S.E. 294 (1937)].").

ing Sophia the authority requested.[5] Jan–Care and the Coalition filed exceptions to the recommended decision. Thereafter, by order entered March 1, 1999, the PSC denied the exceptions and adopted the recommended decision as the PSC's final order. Jan–Care and the Coalition then filed a petition in this Court appealing the PSC's orders regarding Interstate and Sophia. We granted the petition and now affirm in part, and reverse in part, the orders of the PSC.

## II.

### STANDARD OF REVIEW

With regard to the proper standard to be applied when reviewing a final order of the Public Service Commission, we have previously held:

"In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Syl. pt. 2, *Monongahela Power Co. v. Public Service Comm'n,* 166 W.Va. 423, 276 S.E.2d 179 (1981).

Syl. pt. 1, *Berkeley County Pub. Serv. Sewer Dist. v. West Virginia Pub. Serv. Comm'n,* 204 W.Va. 279, 512 S.E.2d 201 (1998). We have also reiterated the *Monongahela Power* holding by stating:

The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

Syl. pt. 1, *Central West Virginia Refuse, Inc. v. Public Serv. Comm'n,* 190 W.Va. 416, 438 S.E.2d 596 (1993). We will follow this standard in addressing the issue raised on appeal.

## III.

### DISCUSSION

The primary issue raised in this appeal is whether the PSC has jurisdiction, pursuant to W. Va.Code § 24A–2–1, *et seq.,* to grant to common carriers the authority to transport persons to and from various health-care facilities, or whether such jurisdiction lies with the Office of Emergency Medical Services[6] pursuant to the Emergency Medical Services Act of 1996, W. Va.Code § 16–4C–1 *et seq.*

The initial argument asserted by Jan–Care and the Coalition relies heavily on the use of the term "patient" in the description of the authority granted to Interstate[7] and the meaning of that term as defined by the Emergency Medical Services Act of 1996. They contend that by granting Interstate the authority to transport "patients," the PSC has authorized Interstate to operate an Ambulance Service in direct contradiction to the PSC's legal authority.[8] Jan–Care and the

---

*overruled on other grounds by Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709 (1981).

**5.** *See supra* note 2.

**6.** The Office of Emergency Medical Services is a division of the Bureau of Public Health, W. Va. Code § 16–4C–4 (1996) (Repl.Vol.1998), which in turn is a division of the Department of Health and Human Resources. W. Va.Code § 5F–2–1(d)(3) (1997) (Supp.1999).

**7.** Sophia was granted authority to transport "passengers" rather than "patients." Therefore, this argument, as framed by Jan–Care and the Coalition, does not logically apply to Sophia. However, Jan–Care and the Coalition assert in their brief that it does apply to Sophia.

**8.** Pursuant to W. Va.Code § 24A–1–3 (5) (1997) (Repl.Vol.1999), the provisions of the West Virgi-

Coalition contend that the transportation of "patients" must be regulated by the Office of Emergency Medical Services pursuant to the Emergency Medical Services Act of 1996.[9] We have considered the record before us, the arguments presented by the various parties and amici curiae, and the relevant statutes. As explained below, we conclude that the PSC has jurisdiction to authorize common carriers to provide for the transportation of certain individuals, who do not have medical needs greater than those of the average population and who are not expected to require the presence of a trained emergency medical technician during transport, to and from health-care facilities. However, we further find that the PSC exceeded its jurisdiction with regard to the specific certificates granted to Interstate and Sophia in the cases *sub judice.*

■ We begin our analysis by examining the Emergency Medical Services Act of 1996 (hereinafter sometimes referred to as "the Act"), W. Va.Code § 16–4C–1, *et seq.,* to determine whether, or to what extent, it precludes the PSC from exercising jurisdiction to authorize common carriers to transport certain individuals to and from various health-care facilities. First, we note that,

when interpreting a statute, this Court must endeavor to give effect to the intention of the Legislature. We recently reiterated this long-standing principle in Syllabus point 3 of *West Virginia Department of Military Affairs and Public Safety, Division of Juvenile Services v. Berger,* 203 W.Va. 468, 508 S.E.2d 628 (1998):

" ' " ' "The primary object in construing a statute is to ascertain and give effect to the intent of the legislature." Syl. Pt. 1, *Smith v. State Workmen's Compensation Com'r.,* 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. Pt. 2, *State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984)." Syllabus point 2, *Lee v. West Virginia Teachers Retirement Board,* 186 W.Va. 441, 413 S.E.2d 96 (1991).' Syl. pt. 2, *Francis O. Day Co., Inc. v. Director, Division of Environmental Protection,* 191 W.Va. 134, 443 S.E.2d 602 (1994)." Syllabus point 4, *Hosaflook v. Consolidation Coal Co.,* 201 W.Va. 325, 497 S.E.2d 174 (1997).

■ In ascertaining the intent of the Legislature, we must not base our determination on a single term or a few select words. Rather, we must give effect to the entire statute. *Ewing v. Board of Educ. of County*

---

nia Code pertaining to PSC regulation of common carriers by motor vehicles do not apply to "[m]otor vehicles used exclusively in ambulance service or duly chartered rescue squad service."

9. In their reply brief and during oral argument, Jan–Care and the Coalition modified their argument somewhat and conceded that the PSC has jurisdiction to grant authority for a multi-passenger van transport. Jan–Care and the Coalition explained that the basis for the change in their argument was the Revised Medicaid Transportation Regulations, which authorize a class of transportation to be provided by a "Specialized Multi–Passenger Van Provider (SMPV)." SMPV is defined in the Medicaid regulations as

[a]n organization or entity which operates specialized multi-passenger vans equipped to transport ambulatory *patients as defined herein.* SMPV vehicles and personnel shall meet the requirements set forth by these regulations. These vehicles and personnel are to provide safe, sanitary and comfortable transportation to and from scheduled medical appointments and cannot be utilized for the transportation of [Advanced Life Support] or [Basic Life Support] medical patients. This category of transportation provider submits claims directly to the Medicaid Program.

Revised Medicaid Regulations, Chapter 200, Transportation Services (effective June 1, 1999). The Medicaid Regulations further provide:

Specialized Multi–Passenger Van Provider (SMPV) Certification: Certification of eligibility issued by the DHHR, Bureau for Medical Services, and the Office of Emergency Services *or the Public Service Commission* and any other federal governing agency or department of the State of West Virginia to any individual, firm, corporation, association, county, municipality or other legal entity for the purposes of providing non-ambulance transportation services to eligible Medicaid beneficiaries in the State of West Virginia.

*Id.* (emphasis added). These revised regulations became effective on June 1, 1999, and, thus, were not before the PSC. Consequently, they may not be considered in determining whether the PSC committed error in the cases underlying the instant appeal. Moreover, these regulations are applicable only to transportation for which Medicaid coverage exists. The record in this case indicates that the authorization sought by Interstate and Sophia included transportations for which other third party payors, or the transportee him or herself, would be financially responsible.

*of Summers,* 202 W.Va. 228, 241, 503 S.E.2d 541, 554 (1998) ("' " 'In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation.' Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975)." Syl. pt. 3, *State ex rel. Fetters v. Hott,* 173 W.Va. 502, 318 S.E.2d 446 (1984).' Syl. pt. 4, *State ex rel. Hechler v. Christian Action Network,* 201 W.Va. 71, 491 S.E.2d 618 (1997)."). *See also Mitchell v. City of Wheeling,* 202 W.Va. 85, 88, 502 S.E.2d 182, 185 (1998) ("We have previously held that no part of a statute is to be treated as meaningless and we must give significance and effect to every section, clause, word or part of a statute as well as to the statute as a whole. *State v. General Daniel Morgan Post No. 548,* 144 W.Va. 137, 107 S.E.2d 353 (1959); *Wilson v. Hix,* 136 W.Va. 59, 65 S.E.2d 717 (1951).").

The purpose of the Emergency Medical Services Act of 1996 has been expressly stated by the Legislature:

The Legislature finds and declares: (1) That the safe and efficient operation of life-saving and life-preserving emergency medical service to meet the needs of citizens of this state is a matter of general public interest and concern; (2) to ensure the provision of adequate *emergency medical services* within this state for the protection of the public health, safety and welfare, it is imperative that minimum standards for *emergency medical service personnel* be established and enforced by the state; (3) that *emergency medical service personnel* should meet minimum training standards promulgated by the commissioner; (4) that it is the public policy of this state to enact legislation to carry out these purposes and comply with minimum standards for *emergency medical service personnel* as specified herein; (5) that any patient who receives *emergency medical service* and who is unable to consent thereto should be liable for the reasonable cost of such service; and (6) that it is the public policy of this state to encourage *emergency medical service providers* to do those things necessary to carry out the powers conferred in this article unless otherwise forbidden by law.

W. Va.Code § 16–4C–2 (1996) (Repl.Vol.1998) (emphasis added). The above-quoted declaration repeatedly uses the terms "emergency medical service" and "emergency medical service personnel." Thus, to fully understand the scope of this Act as expressed in this statement of its purpose, we must consider the meaning of the terms "emergency medical service" and "emergency medical service personnel."

Pursuant to the Act, " '[e]mergency medical service personnel' means any person certified by the commissioner to provide *emergency medical services* authorized in section eight [10] of this article and includes, but is not limited to, emergency medical service attend-

---

**10.** W. Va.Code § 16–4C–8 (1999) (Supp.1999) states:

(a) Every ambulance operated by an emergency medical service agency shall carry at least two personnel. At least one person shall be certified in cardiopulmonary resuscitation or first aid and the person in the patient-compartment shall be certified as an emergency medical technician-basic at a minimum, except that in the case of a specialized multipatient medical transport, only one staff person is required and that person shall be certified, at a minimum, at the level of an emergency medical technician-basic.

(b) As a minimum the training for each class of emergency medical service personnel shall include:

(1) Emergency medical service attendant: Shall have earned and possess valid certificates from the department or by authorities recognized and approved by the commissioner;

(2) Emergency medical technician-basic: Shall have successfully completed the course for certification as an emergency medical technician-basic as established by the commissioner or authorities recognized and approved by the commissioner; and

(3) Emergency medical technician-paramedic: Shall have successfully completed the course for certification as an emergency medical technician-paramedic established by the commissioner or authorities recognized and approved by the commissioner.

The foregoing may not be considered to limit the power of the commissioner to prescribe training, certification and recertification standards.

(c) Any person desiring emergency medical service personnel certification shall apply to the commissioner using forms and procedures prescribed by the commissioner. Upon receipt of the application, the commissioner shall determine whether the applicant meets the certification requirements and may examine the applicant, if necessary to make that determination. If it is determined that the applicant meets all of the requirements, the commissioner shall issue an appropriate emergency medi-

ant, emergency medical technician-basic and emergency medical technician-paramedic." W. Va.Code § 16–4C–3(g) (1999) (Supp.1999) (emphasis added). The term "emergency medical services" is also defined in the Act:

"Emergency medical services" means all services which are set forth in Public Law 93–154 "The Emergency Medical Services Systems Act of 1973" and those included in and made a part of the emergency medical services plan of the department of health and human resources [11] *inclusive of, but not limited to, responding to the medical needs of an individual to prevent the loss of life or aggravation of illness or injury*[.]

W. Va.Code § 16–4C–3(d) (footnote added) (emphasis added). The Emergency Medical Services Systems Act of 1973, Pub.L. No. 93–154, 87 Stat. 594 (repealed), includes a list of services required of an emergency medical services system.[12] The general focus of this

cal service personnel certificate which shall be valid for a period as determined by the commissioner.

State and county continuing education and recertification programs for all levels of emergency medical service providers shall be available to emergency medical service providers at a convenient site within one hundred miles of the provider's primary place of operation at sites determined by the regional emergency medical services offices. The continuing education program shall be provided at a cost specified in a fee schedule to be promulgated by legislative rule in accordance with the provisions of article three [§ 29A–3–1 *et seq.*], chapter twenty-nine-a of this code by the division of health to all nonprofit emergency medical service personnel.

(d) The commissioner may issue a temporary emergency medical service personnel certificate to an applicant, with or without examination of the applicant, when he or she finds that issuance to be in the public interest. Unless suspended or revoked, a temporary certificate shall be valid initially for a period not exceeding one hundred twenty days and may not be renewed unless the commissioner finds the renewal to be in the public interest. The expiration date of a temporary certificate shall be extended until the holder is afforded at least one opportunity to take an emergency medical service personnel training course within the general area where he or she serves as an emergency medical service personnel, but the expiration date may not be extended for any longer period of time or for any other reason.

11. The Department of Health and Human Resources' Emergency Medical Services Plan (available from the Department) contains the Department's general goals in this field, but does not provide a listing of the specific services contemplated. More detailed guidelines pertaining to emergency medical services are set forth in the Emergency Medical Services regulations found at 6A W. Va.C.S.R. § 64–48–1, *et seq.*

12. Section 1206(b)(4)(C) of the Emergency Medical Services Systems Act of 1973, Pub.L. No. 93–154, 87 Stat. 594 (repealed), states in relevant part:

"(C) An emergency medical services system shall—

"(i) include an adequate number of health professions, allied health professions, and other health personnel with appropriate training and experience;

"(ii) provide for its personnel appropriate training (including clinical training) and continuing education programs which (I) are coordinated with other programs in the system's service area which provide similar training and education, and (II) emphasize recruitment and necessary training of veterans of the Armed Forces with military training and experience in health care fields and of appropriate public safety personnel in such area;

"(iii) join the personnel, facilities, and equipment of the system by a central communications system so that requests for emergency health care services will be handled by a communications facility which (I) utilizes emergency medical telephonic screening, (II) utilizes or, within such period as the Secretary prescribes will utilize, the universal emergency telephone number 911, and (III) will have direct communication connections and interconnections with the personnel, facilities, and equipment of the system and with other appropriate emergency medical services systems;

"(iv) include an adequate number of necessary ground, air, and water vehicles and other transportation facilities to meet the individual characteristics of the system's service area—

"(I) which vehicles and facilities meet appropriate standards relating to location, design, performance, and equipment, and

"(II) the operators and other personnel for which vehicles and facilities meet appropriate training and experience requirements;

"(v) include an adequate number of easily accessible emergency medical services facilities which are collectively capable of providing services on a continuous basis, which have appropriate nonduplicative and categorized capabilities, which meet appropriate standards relating to capacity, location, personnel, and equipment, and which are coordinated with other health care facilities of the system;

"(vi) provide access (including appropriate transportation) to specialized critical medical care units in the system's service area, or, if there are no such units or an inadequate number of them in such area, provide access to such units in neighboring areas if access to

list is on providing medical care, particularly in emergency circumstances. For example, Section 1206(b)(4)(C)(vi) requires an emergency medical services system to "provide access (including appropriate transportation) to special critical medical care units." One would surely expect that an individual requiring transportation to a critical medical care unit would also be likely to require medical assistance and may require medical assistance during transportation. In addition, Section 1206(b)(4)(C)(i) requires an emergency medical services system to include "an adequate number of health professions, allied health professions, and other health personnel with appropriate training and experience," and Section 1206(b)(4)(C)(ix) mandates that an emergency medical services system "provide . . . necessary emergency medical services to all patients requiring such services."[13] Similarly, the expressly stated scope of the Emergency Medical Services regulations,[14] which are promulgated by the Department of Health and Human Resources, provides:

> [t]his rule is intended to insure adequate provision of transportation of incapacitated individuals and emergency medical ser-

such units is feasible in terms of time and distance;

"(vii) provide for the effective utilization of the appropriate personnel, facilities, and equipment of each public safety agency providing emergency services in the system's service area;

"(viii) be organized in a manner that provides persons who reside in the system's service area and who have no professional training or financial interest in the provision of health care with an adequate opportunity to participate in the making of policy for the system;

"(ix) provide, without prior inquiry as to ability to pay, necessary emergency medical services to all patients requiring such services;

"(x) provide for transfer of patients to facilities and programs which offer such followup care and rehabilitation as is necessary to effect the maximum recovery of the patient;

"(xi) provide for a standardized patient recordkeeping system meeting appropriate standards established by the Secretary, which records shall cover the treatment of the patient from initial entry into the system through his discharge from it, and shall be consistent with ensuing patient records used in followup care and rehabilitation of the patient;

"(xii) provide programs of public education and information in the system's service area (taking into account the needs of visitors to, as well as residents of, that area to know or be able to learn immediately the means of obtaining emergency medical services) which programs stress the general dissemination of information regarding appropriate methods of medical self-help and first-aid and regarding the availability of first-aid training programs in the area;

"(xiii) provide for (I) periodic, comprehensive, and independent review and evaluation of the extent and quality of the emergency health care services provided in the system's service area, and (II) submission to the Secretary of the reports of each such review and evaluation;

"(xiv) have a plan to assure that the system will be capable of providing emergency medical services in the system's service area during mass casualties, natural disasters, or national emergencies; and

"(xv) provide for the establishment of appropriate arrangements with emergency medical services systems or similar entities serving neighboring areas for the provision of emergency medical services on a reciprocal basis where access to such services would be more appropriate and effective in terms of the services available, time, and distance."

13. Emergency medical services systems are also required to "provide for transfer of patients to facilities and programs which offer such followup care and rehabilitation as is necessary to effect the maximum recovery of the patient." Section 1206(b)(4)(C)(x), Emergency Medical Services Systems Act of 1973. However, the list of criteria contained in Section 1206(b)(4)(C) of the 1973 Act are connected with the conjunction "and." We have previously recognized that

> "[a]nd" is a conjunction connecting words or phrases, expressing the idea that the latter is to be added to or taken along with the first; in its conjunctive sense the word "and" is used to conjoin words, clauses or sentences, expressing the relation of addition or connection, and signifying that something is to follow in addition to that which proceeds, and its use implies that the connected elements must be grammatically coordinate, as where the elements preceding and succeeding the word "and" refer to the same subject matter.

*Ooten v. Faerber*, 181 W.Va. 592, 597, 383 S.E.2d 774, 779 (1989) (citing Black's Law Dictionary 79 (5th ed.1979), and determining that use of the term "and" "clearly ma[de] both conditions necessary, not merely either of the two."). Because of the use of the conjunctive "and," all of the services contained in Section 1206(b)(4)(C) of the 1973 Act are required of an emergency medical services system. Thus, while an emergency medical services system may be required to simply transport individuals to various health-care facilities, it must, nevertheless, be properly trained and prepared to render medical treatment as contemplated by the Act.

14. See *supra* note 11.

vices to the citizens of West Virginia; to meet the needs and goals set out in W. Va.Code § 16–4C–2; and to provide clear direction to emergency medical services personnel and agencies in West Virginia. 6A W. Va.C.S.R. § 64–48–1.1 (1997). Moreover, the statement of purposes expressed in W. Va.Code § 16–4C–2 initially identifies emergency medical services that are "lifesaving" and "life-preserving," which implies that some level of medical care will be available to citizens utilizing "emergency medical services."

These various provisions and definitions reveal that emergency services personnel and providers who render emergency medical services, as contemplated by the Emergency Medical Act of 1996, must be qualified to provide some level of medical treatment. This observation is further supported by the fact that the Act authorizes "specialized multipatient *medical* transport," W. Va.Code § 16–4C–8(a) (1999) (Supp.1999) (emphasis added).[15] A "specialized multipatient medical transport" is defined as

> a type of ambulance transport provided for patients with medical needs greater than those of the average population, which may require the presence of a trained emergency medical technician during the transport of the patient: Provided, That the requirement of "greater medical need" may not prohibit the transportation of a patient whose need is preventative in nature.

W.Va.Code § 16–4C–3(r). This section of the West Virginia Code demonstrates that the transportation of patients who merely have "medical needs greater than those of the average population, which *may* require the presence of a trained emergency medical technician during the transport" falls within the purview of the Act. Therefore, one endeavoring to provide such a service must be licensed or certified by the Commissioner of the Bureau of Public Health (hereinafter "the Commissioner"), upon whom the duty of licensing emergency medical services agencies and emergency medical service personnel falls:

> Any person who proposes to establish or maintain an emergency services agency *shall* file an application with the commissioner. . . .
>
> Upon receipt and review of the application the commissioner shall issue a license if he or she finds that the applicant meets the requirements and quality standards, to be established by the commissioner, for an emergency medical services agency license. . . .

W.Va.Code § 16–4C–6a (1996) (Repl.Vol. 1998) (emphasis added).

> Any person desiring emergency medical service personnel certification *shall* apply to the commissioner using forms and procedures prescribed by the commissioner. Upon receipt of the application, the commissioner shall determine whether the applicant meets the certification requirements and may examine the applicant, if necessary to make the determination. If it is determined that the applicant meets all of the requirements, the commissioner shall issue an appropriate emergency medical service personnel certificate which shall be valid for a period as determined by the commissioner.

W.Va.Code § 16–4C–8 (emphasis added).

The above quoted statutes employ the mandatory term "shall" in instructing that applications for emergency medical services agency licensure and emergency medical service personnel certification be tendered to the Commissioner. We have frequently explained that

> " ' "[t]he word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Point 2 Syllabus, *Terry v. Sencindiver,* 153 W.Va. 651[, 171 S.E.2d 480 (1969) ].' Syl. pt. 3, *Bounds v. State Workmen's Compensation Comm'r,* 153 W.Va. 670, 172 S.E.2d 379 (1970)." Syl. pt. 9, *State ex rel. Goff v. Merrifield,* 191 W.Va. 473, 446 S.E.2d 695 (1994) (citation alteration in original).

*State ex rel. Clark v. Blue Cross Blue Shield of West Virginia, Inc.,* 203 W.Va. 690, 702, 510 S.E.2d 764, 776 (1998). Consequently, we hold that any company or individual seeking to operate an emergency medical services agency or to provide emergency medical services, which services require the presence of

---

**15.** See *supra* note 10 for text of W. Va.Code § 16–4C–8.

a trained emergency medical technician during transport, must obtain the proper licensure or certification from the Commissioner of the Bureau of Public Health pursuant to the Emergency Medical Services Act of 1996, W. Va.Code § 16–4C–1, *et seq.* This holding also comports with the exemption of vehicles used exclusively in ambulance service from the statutory provisions relating to the PSC's authority over motor carriers of passengers and property for hire contained in W. Va. Code § 24A–1–3(5) (1997) (Repl.Vol.1999).

Turning to the question of the PSC's jurisdiction in this area, we have reviewed the Emergency Medical Services Act of 1996 in its entirety, and find nothing precluding the PSC from granting a certificate of convenience and necessity to a common carrier who endeavors to transport individuals who do not have medical needs greater than those of the average population and who are not expected to require the presence of a trained emergency medical technician during transport. Nor is such authority prohibited in sections of the W. Va.Code that pertain to the PSC's "power, authority and duty to supervise and regulate the transportation of persons and property for hire by motor vehicles upon or over the public highways of this state." W. Va.Code § 24A–1–1 (1987) (Repl. Vol.1999).

However, due to the significant public interest in providing and maintaining adequate and safe emergency medical services, *see* W. Va.Code § 16–4C–2, it is crucial that the PSC, in granting authority to various common carriers permitting them to transport persons for health-related purposes, carefully and specifically describe the authority granted so as to demonstrate that it has not exceeded its jurisdiction and thereby infringed upon the authority of the Commissioner of the Bureau of Public Health.

■ We therefore hold that, pursuant to W. Va.Code § 24A–2–5 (1980) (Repl.Vol. 1999), which provides that a common carrier by motor vehicle must obtain from the Public Service Commission a certificate of convenience and necessity in order to legally operate within this State, the Public Service Commission has jurisdiction to grant a certificate of convenience and necessity authorizing a common carrier by motor vehicle to transport individuals, who do not have medical needs greater than those of the average population and who are not expected to require the presence of a trained emergency medical technician during transport, to and from health-care facilities. In granting such authority, however, the Public Service Commission must carefully and specifically describe the authority granted so as to demonstrate that it has not exceeded its jurisdiction and thereby infringed upon the authority of the Commissioner of the Bureau of Public Health as set forth in the Emergency Medical Services Act of 1996, W. Va.Code § 16–4C–1, *et seq.*[16]

■ Considering the certificates of convenience and necessity granted to Interstate and Sophia in light of the foregoing holding, we find that the PSC exceeded its jurisdiction.[17] There is nothing in either certificate indicating that Interstate and Sophia are

---

**16.** Jan–Care and the Coalition, along with some of the Amici Curiae who submitted briefs for our consideration in deciding this case, encourage us to set forth a specific statement to be used by the PSC in granting to common carriers the type of authority at issue in this case. For example, relying, at least in part, on the Revised Medicaid Transportation Regulations, which authorize a class of transportation to be provided by a "Specialized Multi–Passenger Van Provider," these parties suggest that we require a common carrier passenger to be ambulatory and to have a previously scheduled medical appointment, and that we prohibit the use of company names that imply the availability of medical treatment by common carriers who are not authorized to provide such services. While such criteria may be well advised, we decline to enter into the realm of crafting agency regulations. Instead, we leave that task to the agencies who possess the neces-

sary expertise and who are not limited by an appellate record, but have access to all of the data relevant to creating such regulations. Indeed, during oral argument, counsel for the Department of Health and Human Resources stated that that agency has plans to issue regulations regarding how "Specialized Multi–Passenger Van Providers" under the Revised Medicaid Transportation Regulations may represent themselves to the public.

**17.** Interstate was granted the authority to operate as a common carrier by motor vehicle in the transportation of patients in specialized limousine service to and from physicians' offices, hospitals and other health-care facilities between points and places in Fayette and Raleigh Counties, on the one hand, and points and places in West Virginia, on the other hand, excluding, however, all trips that would both

prohibited from providing medical treatment, even in emergency situations, to their clients. Moreover, while Interstate and the PSC do not appear to have intended the term "patient" as used in the certificate of convenience and necessity to have the meaning assigned to that term by the Emergency Medical Services Act of 1996,[18] we find the manner in which that term was used could lead one to the conclusion that a passenger may be a patient of the common carrier. Therefore, we conclude that the PSC erred and exceeded its jurisdiction by granting to Interstate and Sophia broader authority than it was entitled to grant.[19]

## IV.

### CONCLUSION

For the foregoing reasons, the final orders of the Public Service Commission granting certificates of convenience and necessity to Interstate Medical Transport, Inc., and Sophia Volunteer Fire and Ambulance Service, Inc., are affirmed insofar as they conclude that the PSC had jurisdiction to authorize a common carrier to provide transportation to and from health-care facilities; reversed insofar as the certificates of necessity and convenience awarded in these cases exceeded that jurisdiction; and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

Judge RISOVICH sitting by temporary assignment.

---

begin and end within either of the aforesaid counties.
Sophia was granted the authority to
operate as a common carrier by motor vehicle in the transportation of passengers to and from the offices of physicians and other health care providers, between points and places in Raleigh County, on the one hand, and points and places in West Virginia, on the other hand.

**18.** The term "patient" is defined in the Act as "any person who is a recipient of the services provided by emergency medical services." W. Va.Code § 16–4C–3(*o*).

**19.** Jan–Care and the Coalition raised additional errors challenging the authority granted to Interstate and Sophia. Because we have determined that the PSC exceeded its jurisdiction in granting the challenged authority, we need not reach these additional issues.