# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Jacquelyn Milliron,**
**Petitioner**

**FILED**

**June 9, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 17-0384**

**The Public Service Commission of West Virginia,**
**and the Jefferson County Public Service District,**
**Respondents**

## MEMORANDUM DECISION

Petitioner Jacquelyn Milliron, appearing pro se, appeals the order of the West Virginia Public Service Commission ("the Commission") that granted the Jefferson County Public Service District's ("the PSD's") application for a certificate of convenience and necessity to upgrade its facilities ("the project"), and approved a post-project rate increase to cover the estimated costs. The PSD appears by counsel Robert R. Rodecker and Laura A. Hoffman. The Public Service Commission of West Virginia ("the Commission"), by counsel Richard E. Hitt and Robert M. Adkins, has filed its requisite Statement of Reasons for the Entry of its Order.[1]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the Public Service Commission is appropriate under Rule 21 of the Rules of Appellate Procedure.

On May 12, 2016, the PSD filed an application with the Commission for a certificate of convenience and necessity to complete the project through the upgrade of its wastewater collection and transmission system and the replacement of certain facilities that are approximately thirty years old. The application included a request for approval of a related inter-utility agreement and a request to implement a post-project rate increase. During the Commission's public comment period, more than 35 objections were filed. After receiving evidence, the Commission approved the PSD's application, concluding that the PSD met its burden of proof and demonstrated that the project is needed and the resulting facilities would serve the general public convenience. Ms. Milliron, one of three intervenors before the

---

[1] Petitioner has filed a motion to supplement the record with a memorandum that she forwarded, post-hearing, to the Commission, and minutes from a meeting of the Jefferson County Commission which was conducted after entry of the Commission's final order. Petitioner's motion is denied.

1

Commission, appeals the Commission order.[2]  Ms. Milliron argues that the Commission's findings of fact were arbitrary and that the PSD project is "not needed at this time."[3]

We review Ms. Milliron's assignments of error according to the following standard:

> "'In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The [C]ourt's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.' Syl. pt. 2, *Monongahela Power Co. v. Public Service Comm'n*, 166 W.Va. 423, 276 S.E.2d 179 (1981)." Syllabus point 1, *Berkeley County Public Service Sewer District v. West Virginia Public Service Commission*, 204 W.Va. 279, 512 S.E.2d 201 (1998).

Syl. Pt. 1, *Jan-Care Ambulance Serv., Inc. v. Pub. Serv. Comm'n of W. Va*, 206 W. Va. 183, 185, 522 S.E.2d 912, 914 (1999). To reiterate:

> "The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's

---

[2] The remaining intervenors—the City of Charles Town and the City of Ranson—made no appearance on appeal.

[3] Particularly, Ms. Milliron argues that the Commission incorrectly found that significant risks of failure of the utility's system would occur if the project was delayed; the project was not designed to address future customer growth; isolated manhole overflow and sewer backup events demonstrate the need for the project; certain pump stations are obsolete and appropriate for decommissioning; gravity lines are not prone to septicity in comparison with old and aging pump stations; the rebuilding of existing pump stations is cost-prohibitive and would require excessive time for completion; the project sufficiently identifies ownership of infrastructure scheduled for improvement; the project affects only areas where Charles Town and Ranson do not operate; rates were reviewed for fairness; and the potential for consolidation of services with nearby cities was not affected by project approval.

findings; and, (3) whether the substantive result of the Commission's order is proper." Syllabus point 1, *Central West Virginia Refuse, Inc. v. Public Service Commission*, 190 W.Va. 416, 438 S.E.2d 596 (1993).

Syl. Pt. 2, *Jan-Care Ambulance Serv., Inc.*

Upon consideration of these tenets applied to the facts before us, we find that the Commission acted within its authority and rested its conclusions on adequate evidence, and the substantive result is correct. Though Ms. Milliron supported her position with thoughtful and articulate reasoning, her arguments are not sufficient to overcome the opinions of the various professional engineers and managers whose testimony was received by the Commission. We note that multiple witnesses testified that the PSD's systems are burdened with reliability problems, capacity issues, and aging and failing equipment. Certain pump stations within the PSD's system—those which would be decommissioned under the project—are outmoded and often require the manufacture of parts when repairs are required. Ultimately, the Commission concluded that "the service issues to be corrected by the [p]roject cannot be put off for an extended period of time without bringing into play the real possibility of failures in the [PSD] system." There is no evidence to the contrary in the record before us.

The Commission adequately addressed each of the issues that Ms. Milliron raises on appeal. For that reason, we hereby adopt and incorporate the Commission's findings of fact and conclusions of law, and direct the Clerk to attach a copy of the Commission order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 9, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

3

**PUBLIC SERVICE COMMISSION
OF WEST VIRGINIA
CHARLESTON**

At a session of the PUBLIC SERVICE COMMISSION OF WEST VIRGINIA in the City of Charleston on the 23rd day of March 2017.

CASE NO. 16-0616-PSD-PC-CN

JEFFERSON COUNTY PUBLIC SERVICE DISTRICT
a public corporation.
Application for a certificate of convenience and necessity to construct wastewater collection and transmission system improvements, authorize Post-Project rates and petition for approval of an inter-utility agreement.

**COMMISSION ORDER**

The Commission grants the application for a certificate of convenience and necessity (CCN) and approves a Post-Project rate increase.

**I. INTRODUCTION**

This case involves a request by the Jefferson County Public Service District (District) for Commission approval of an application (Application) for a certificate of convenience and necessity to construct improvements and upgrades to its wastewater collection and transmission system (Project) and to implement a Post-Project rate increase. The Project is estimated to cost approximately $6.9 million and includes construction of 15,400 feet of 15-inch and 24-inch gravity sewer mains, a new 0.26 million gallons per day (MGD) (at average flow) Halltown Pump Station, and 4,900 feet of 12-inch force mains.

According to the District, the Project is needed because the collection system in the District's Flowing Spring service area has reached its capacity limits at several key locations and numerous pump stations have reached the end of their useful lives. The Project eliminates six outdated pump stations, including the Breckenridge Pump Station that has recently experienced sewer back-ups into homes during peak flow events, and four pump stations that currently direct flow to the Old Town Ranson North Mildred Street system where capacity and overflow issues have occurred. Several factors, in addition to the magnitude of the Project, make review of this Project complex for the Commission:

1. The geography, or location, of the District's service area is closely bordered by, and in some places overlapping with, the service areas of the City of Charles Town (Charles Town) and the City of Ranson (Ranson), collectively referred to as the "Cities";

2. The District uses treatment and collection system facilities owned by the Cities for critical components of its system, including the Charles Town Wastewater Treatment Plant (CTWWTP) and the Ranson Flowing Springs Pump Station;

3. The District rates are relatively high;

4. The concurrent processing of this certificate case with the base rate case filed by the District on July 8, 2015;

5. There was substantial protest and opposition to the Project by the Intervenors and the public;[1] and

6. The Staff and Intervenors urged denial or delay of the Project to provide additional time to explore an acquisition, consolidation or merger of the Cities and District systems. (The Cities and Ms. Milliron may be collectively referred to as Intervenors.)

The District service area is in an area of Jefferson County bordered by (in some cases overlapping with) the Cities. The District was founded in the early 1980s to facilitate sewer service to residents outside the Cities' service areas. Historically, Jefferson County has experienced high customer growth, and that growth is projected to continue for the District as the area continues to be closely related to the expanding Washington, D.C. metropolitan area. The Cities have, over the years, annexed areas that include portions of the District's service area. Because of the overlapping service areas and municipal boundaries, many District customers live in close proximity to customers of the Cities. The rate disparity between the Cities and the District customers is a point of confusion and concern for some customers.

The District purchases virtually all of its wastewater treatment from Charles Town as a bulk customer. In 2008, the District entered into a Sewer Transmission Agreement with Ranson to allow the District to utilize a negotiated percentage of the Flowing Springs Pump Station capacity to transport District flows to the CTWWTP. The District to some extent also utilizes the Ranson Old Town Collection System (Old Town System or North Mildred Street system) to deliver District flows from the District's Northern Route 9 service area for treatment at the CTWWTP. The Cities and the District have

---

[1] The Commission received a total of 37 letters of protest, including from the Jefferson County Commission, the Jefferson County Board of Education, and the Breckenridge Owners Association, Inc. Substantial public comment in opposition to the project was given at the public comment hearing held on January 19, 2017. In a letter filed January 25, 2017, the Jefferson County Commission advised the Commission that in a 3-2 vote, a formal motion in opposition to the project was adopted. The Commission received two letters in support of the Project on January 27 and 30, 2017, respectively, from two county commissioners in their individual capacity.

attempted to coordinate their operations and have worked with each other in sharing facilities to the extent possible in order to avoid unnecessary duplication of service and disputes. These coordination efforts have, at times, resulted in confusion and tension over who should construct facilities to meet increased customer demand in certain areas of Jefferson County.

The District plan to upgrade existing facilities is not new to the Commission. In a reopening of the certificate filing to construct the Flowing Springs Wastewater Treatment Plant[2] (Flowing Springs Plant Case), the District testified that if the Commission rescinded the Flowing Springs Plant certificate, the District would pursue a major transmission upgrade project to alleviate force main restrictions, replace aged, unreliable pump stations and increase collection system capacity in the Flowing Springs basin. That project, at that time, was estimated to cost approximately $15 million, and the District stated it expected to file a certificate to construct that project in June 2012, if the Flowing Springs Plant certificate was denied. In the 2009 Flowing Springs Plant Case, the District estimated that the average monthly sewer bill for a residential customer would increase from $57.20 to $82.49 after completion of the collection system upgrade project.[3]

In the November 25, 2014 Order issued in Case No. 12-0513-PSD-42T-PC,[4] the Commission ordered the District to file a wastewater improvement strategic plan within 150 days or with the filing of a certificate of need for system improvements, whichever occurred first. The Commission ordered that the strategic plan address system improvements needed to serve both current and future customers through 2032 and consider possible alternatives through 2050.

On January 27, 2015, the District requested an additional 120 days to file the strategic plan and the Commission granted the District request by Order issued on March 27, 2015. The District filed the Wastewater Strategic Plan 2015 (2015 Strategic Plan) prepared by Dunn Engineers, Inc. on August 13, 2015. The 2015 Strategic Plan included the descriptions and cost estimates for the Northern Route 9/Halltown Pump Station Project that is the subject of this proceeding.

After receiving a letter[5] from Ranson in June 2014 that requested the District alleviate the flow into the Ranson Old Town System from the District Northern Route 9 area, the District initiated the review process for funding of the entire Northern Route 9/Halltown booster project (estimated to cost approximately $15 million) with the IJDC. Subsequently, the District lowered the estimated cost to match the available funding for

_____

[2] Jefferson County Public Service District, Case No. 09-0347-PSD-PC-CN (Reopened), Order of August 12, 2011 at 20, Finding of Fact No. 16.

[3] Id. August 12, 2011 Order at 20, Finding of Fact 12.

[4] Jefferson County Public Service District, Case No. 12-0513-PSD-42T-PC (Reopened), Order of November 25, 2014, at 7.

[5] District Ex. SL-R, Ex. SLR-1.

3

the project. That is the Project before the Commission in this proceeding and it is now estimated to cost $6.9 million. In addition, Ranson and the District negotiated a new Sewer Transportation Agreement addressing the use and upgrade of the Flowing Springs Pump Station. The District obtained an interim loan in the amount of $660,000 for interim financing in order to proceed with the engineering design of the Project.

On August 13, 2015, the District filed a Rule 42R application to increase rates and charges by approximately 13.5 percent, effective on the date of filing. Jefferson County Public Service District, Case No. 15-1338-PSD-42R-PC (42R Case). In the 42R Case, the District requested rate recovery for the debt service payments on the $660,000 interim financing note, the SB234[6] cash working capital reserve, increased Bioxide treatment expense, an increase in its Capacity Improvement Fee (CIF), and the addition of a Capacity Assurance Fee (CAF) to its tariff, along with several smaller adjustments to the per book numbers.

The Commission entered an Order today in the 42R Case (2017 Rate Order). In that case, the review of the proposed CIFs and CAFs involves issues of customer growth and operational constraints such as system capacity. In addressing the justification for the Capacity Fees in that 2017 Rate Order, the Commission noted that Staff's investigation concluded that several components of the District's system are operating at, or above, capacity.[7]

The Commission received comments from the public and local governmental officials about the impact that the Project will have on District rates. Some protest letters have been received, and several members of the public voiced their concern about high rates at the public comment hearing held by the Commission in Shepherdstown. We understand that the rates charged by the District are high. In fact, the rate increase accompanying the District certificate filing in 2009 Flowing Springs Plant Case was a factor, along with the loss of low cost financing, in the Commission's reconsideration of a certificate that had been granted prior to reopening of that case. The Flowing Springs Plant Case was reopened because favorable American Recovery and Reinvestment Act funding was not available as the District had hoped, and the District reopened the case seeking approval of less favorable public sector financing alternatives (and resulting higher rates). Ultimately, it was determined that the upgrades made to the Charles Town treatment facilities provided a lower cost alternative to the District customers than constructing the Flowing Springs Plant.

In addition, the issue of consolidation was raised in this case by Staff and the Intervenors as a reason to deny the requested certificate for the Project. The position of Intervenors, and comments of the Jefferson County Commission, favor further study and negotiation of consolidation. Those consolidation studies (and negotiations) will take

---

[6] The West Virginia Legislature added the cash working capital reserve requirement in 2015 with the passage of Senate Bill 234 (SB234).

[7] Id., Order of March 23, 2017, at 18.

4

time to complete. Intervenors and Cities argued that approval of the Project and the associated debt to finance the Project could hamper consolidation efforts and that the Project should be postponed or delayed until potential consolidation efforts can be fully explored.

Consolidation of sewer systems has been discussed for some time in Jefferson County, but so far those discussions have been unsuccessful. While the Commission encourages consideration of consolidation to continue, we must weigh the present need for this Project and the present need for continued reliable service for current and future District customers against an acquisition, consolidation or merger plan that is far from defined, and even further from fruition.

It is against this background that the Commission must consider the Project.

## II. PROCEDURAL HISTORY

On May 12, 2016, the District filed the Application for the Project and petitioned for approval of an inter-utility agreement and post-project rates. Petitions to Intervene were filed and granted to Ms. Milliron, Charles Town, and Ranson. Two petitions to toll the statutory deadline were filed for and granted to the District. The parties to the case, including the Commission Staff, have actively engaged in discovery and various other procedural matters.

On February 2 and 3, 2017, an evidentiary hearing was held as scheduled in Charleston, witnesses appeared and testified and all testimonies and exhibits were entered into the record. The hearing resulted in two separate transcripts. Citations to the Hearing Transcripts in this Order will be Tr. I (transcript from February 2, 2017) and Tr. II (transcript from February 3, 2017). On February 6, 2017, Charles Town filed a Commission requested post-hearing exhibit, identified as Commission Post-Hearing Ex. 1. On February 15, 2017, Staff, Charles Town, Ranson and Ms. Milliron filed initial briefs and the District filed a Proposed Order in Lieu of Initial Brief. On February 21, 2017, the District, Charles Town and Ms. Milliron filed reply briefs.

A detailed summary of the procedural history for this case is included in Appendix B attached to this Order.

## III. EVIDENCE PRESENTED AT HEARING

The Project requires a CCN from the Commission. Specifically, W.Va. Code §§24-2-11(a) and (b) provide that a public utility, person or corporation may not begin construction of any plant, equipment, property or facility for furnishing to the public any [utility] service, except ordinary extensions of existing systems in the usual course of business, unless and until it obtains a certificate of convenience and necessity authorizing such construction. In considering whether to grant a certificate of convenience and

5

necessity, the Commission must assess whether the general public convenience will be served and assess the public necessity for the Project. Sexton v. Public Service Commission, 188 W. Va. 305, 423 S.E.2d 914 (1992).

## A. Scope of the Project

In its Application, the District argues that the Project is needed to replace facilities that have been in service for nearly 30 years and that, through the passage of time, wear and tear, and increased demand, have become inadequate. The District states that facilities need to be replaced in order to provide reliable and economical sewer service to the District's customers and to increase capacity to accommodate projected additional growth:

Existing facilities are being replaced with larger capacity facilities so that the District can better meet expected growth over the life of the new facilities consistent with responsible engineering practices.

Application at 4.

According to Mr. Wayne Morgan,[8] the District engineer, the Project consists of these major components:

1. A 15-inch gravity interceptor transmission line beginning at pump station 1-10 and extending 8,450 feet to connect to a 15-inch main at Aspen Green.

2. A 15-inch gravity interceptor transmission line beginning at the 15-inch main built at Aspen Green and extending 2,050 feet to the present site of the Breckenridge Pump Station.

3. A 24-inch gravity interceptor transmission line connecting to the 15-inch line at the Breckenridge Pump Station and extending 4,900 feet to the site of the new Halltown Pump Station (to be built at the present site of the Beallair pump station).

4. A new Halltown Pump Station capable of increasing flow to 786,000 per day at maximum flow.

5. A 12-inch force main beginning at the Halltown Pump Station and extending 4,900 feet to the existing 8-inch force main at the current Breckenridge Pump Station, a main that terminates at the Flowing Springs Pump Station.

6. Decommissioning six existing pump stations, including pump stations 1-10, 1-11, 1-12 and 1-157 that currently pump into the North Mildred Street mains

---

[8] District Ex. WDM-D, Attachment WDM-3.

6

located in Ranson, and the Breckenridge and Beallair Pump Stations that pump District flows to the Flowing Springs Pump Station.

7. Decommissioning the existing 6-inch Beallair force main.

The proposed Project funding is: (1) a $3,575,000 United States Department of Agriculture Rural Development (USDA RD) loan at a 2.5 percent interest rate over 40 years and (2) a West Virginia Department of Environmental Protection Clean Water State Revolving Fund (DEPSRF) loan of $2,844,984 at .25 percent interest and .25 percent administrative fee for a term of up to 40 years. District Ex. WDM-D, Ex. WDM-4. The DEPSRF funding package includes a provision for debt forgiveness in the amount of $500,000. District Cross Ex. 1, Letter of Assurance from the Department of Environmental Protection (DEP) of January 17, 2017.

The Application originally requested approval of a new Sewer Transportation Agreement (2015 Agreement) between the District and Ranson governing the use of the Flowing Springs Pump Station. The proposed 2015 Agreement included upgrades to the pump station and increased District flows from those permitted under the existing Sewer Transportation Agreement (2008 Agreement). In addition, the proposed 2015 Agreement required the District to amend its tariff to allow Ranson CIFs to be charged to new District customers utilizing the Flowing Springs Pump Station. In its Petition to Intervene filed on June 24, 2016, Ranson indicated that it had withdrawn from the 2015 Agreement, stating its belief that execution of the 2015 Agreement is no longer in the best interest of the City.

As a result of Ranson's withdrawal from the 2015 Agreement, the DEP required revisions to the Project that included removal of the proposed upgrades to the Flowing Springs Pump Station and the existing 12-inch force main owned by Ranson. Revising the Project components lowered the estimated cost from approximately $7.1 million to $6.9 million.

B. Project Need

In support of the Project, Susanne Lawton, General Manager for the District, testified that the Project would address several critical service reliability issues that exist in the District collection system:

1. Eliminate capacity constraints that exist at numerous points in the collection system;

2. Replace several pump stations near the end of their useful life and operating near capacity;

3. Eliminate stormwater overflows; and

7

4. Divert flows from the Old Town Ranson system.

District Ex. SL-D at 3, 8.

Ms. Lawton described issues specific to the Breckenridge pump station, a pump station originally intended to be a temporary station to handle flows from the Breckenridge Development. The Breckenridge pump station now handles additional flows from the Beallair area and is operating above its intended capacity. That causes backups from the Breckenridge station that in turn have caused the District's insurer, the West Virginia Board of Risk, to pay property damage claims on three occasions and to settle a lawsuit filed against the District. Ms. Lawton claimed the back-up and overflow problems at the Breckenridge pump station will continue to grow unless the upgraded transmission mains and pump station included in the Project are constructed. District Ex. SL-D at 8-9, Tr. I at 131.

On cross-examination about possible catastrophic failures, Ms. Lawton stated that the Breckenridge Pump Station will likely continue to have failures that cause backups. She testified that hundreds of thousands of dollars have been spent on that station, yet she still does not trust it not to fail. Tr. I and 151.

Ms. Lawton stated that there are capacity and overflow issues in the Old Town Ranson system that will continue unless current District Flows in the Northern Route 9 area are diverted to the transmission mains to be constructed by the Project. The four pump stations that currently pump into the Old Town Ranson system are old, and repair parts are no longer available. As a result, the District must purchase new panels or specially manufacture repair parts to keep the pump systems operating. Tr. I at 175-176. Ms. Lawton claimed that the patchwork of smaller pump stations and force main systems of the District must be replaced by a proper backbone of transmission mains if the District is to operate in an environmentally and economically sound manner and in the long-term best interests of the public. Id. at 152–55.

Mr. Morgan, an engineer with Thrasher Engineering, testified about various issues in the District's collection system and in favor of the Project. Mr. Morgan stated that the Project addresses two specific areas of the District collection system that are experiencing service reliability and capacity issues, the Northern Route 9 Sewer System (N. Rt. 9 System) and the Flowing Springs Basin System.

The District N. Rt. 9 System collects flows from residential customers, commercial developments, schools and an industrial park. Those flows are then directed to a series of pump stations that discharge into the 10-inch line at North Mildred Street and ultimately to the CTWWTP. The District N. Rt. 9 System flows use approximately 86 percent of the capacity in that 10-inch line and at times larger flows on that line trigger manhole overflows. The series of District pump stations in the N. Rt. 9 area are nearly thirty years old and must be decommissioned, replaced or rebuilt.

8

In June 2014, Ranson requested the District develop a plan to alleviate the capacity and manhole overflow issues caused by the District's use of the North Mildred Street main. In response to the Ranson request to divert District flows in the N. Rt. 9 System away from the North Mildred Street 10-inch main, the District included the installation of 15-inch and 24-inch interceptor lines that divert those flows to the District Flowing Springs Basin System as part of its 2015 Strategic Plan. Those 15-inch and 24-inch interceptor lines, along with the new Halltown Pump Station and associated 12-inch force main, will permit the decommissioning of the four outdated pump stations that currently transfer the District N. Rt. 9 System flows to the 10-inch North Mildred Street main. District Ex. WDM-D at 3-5, 9.

Mr. Morgan testified that, in addition to removing the N. Rt. 9 System flows from the North Mildred Street main as requested by Ranson, additional upgrades are needed in the District's Flowing Springs Basin System. He testified that the Breckenridge Pump Station is the primary service issue existing in the Flowing Springs Basin System. The Breckenridge Pump Station has limited capacity and experiences failures during peak flow periods. According to Mr. Morgan, the station was intended to be a temporary pump station, but has become burdened with flows in excess of design capacity. The District upgraded that station in 2008 to provide temporary relief until construction of the Flowing Springs Plant, a project for which a certificate was ultimately denied. Id. at 5.

Fred Hypes, an engineer with Dunn Engineers Inc. (Dunn), also provided testimony about the condition of the District's collection system, the District's 2015 Strategic Plan and the need for the Project. The District retained Dunn to prepare a long term strategic plan and to provide day-to-day engineering services, as needed. The District filed its 2015 Strategic Plan in August 2015.[9] District Ex. FH-D at 2. According to Mr. Hypes, the Project is consistent with the 2015 Strategic Plan. The pump stations being eliminated by the Project are maintenance intensive and problematic in the District system. The removal of these pump stations will reduce maintenance costs. Removing a significant amount of the District N. Rt. 9 System flow from the Old Town Ranson mains will also relieve capacity and overflow issues in that area. The 2015 Strategic Plan recommended these improvements (now $6.9 million). Id. at 3.

## C. Opposition to the Project

Staff and the Intervenors oppose the Project, and recommend that the Project be denied, or at least delayed, to accommodate further discussion about acquisition, consolidation or merger of the sewer systems of the District and the Cities.

Jonathan M. Fowler, Staff engineer, stated that the Project and the estimated cost of the Project are well described in the filing and various supplements. Mr. Fowler

---

[9] In Case No. 12-0513-PSD-42T-PC, the Commission ordered the District to file a strategic plan which addresses the wastewater treatment needs of the community through 2032 and consider possible alternatives through 2050.

focused primarily on the need and timing of the Project. Staff Ex. JMF-D at 2. He testified that he had reviewed the Project beginning with the District's preliminary application for funding filed with the IJDC in December 2014 and that as the Commission representative to the IJDC he was familiar with the Project. Id. at 3. In the initial IJDC filing, the District estimated the original project cost at approximately $15 million. Tr. I at 45. Following the IJDC initial review, the District redesigned the Project to the $7.1 million Project that was filed in this case. Id. at 46.

Mr. Fowler raised concerns that the Project may (i) duplicate sewer facilities currently provided by the Cities, (ii) complicate the issue of consolidation of the three publicly-owned utilities by the issuance of new debt by the District for the Project, (iii) add capacity to the Flowing Springs Pump station that is not currently needed, (iv) address capacity issues in the Northern Rt. 9 area that are not the responsibility of the District to fix, and (v) preempt effective review and endorsement of the Project by a consolidated entity. Staff Ex. JMF-D at 6-8.

Mr. Fowler did not testify that the Project was inadequate or improper; he testified that the Project should be denied or delayed for twelve months to determine whether consolidation is going to move forward. He stated that if there is no recommendation within twelve months to consolidate the three systems, we will be back where we are today assessing the need for the Project. Tr. I at 65, 71.

Mr. Fowler recommended delay or denial of the CCN because (i) there are no urgent capacity problems with the District's system; (ii) the District has not shown that growth is a material factor driving the Project or that growth will exhaust available capacity any time soon; (iii) the Project is not necessary to serve new customers; and (iv) the Project does not represent orderly and efficient development of facilities and service. Staff Ex. JMF-D at 10.

Mr. Fowler admitted that pump stations are expensive to maintain, and there is considerable evidence that the cost of maintaining the pump stations to be replaced by the Project has been escalating over time. His objection to the approval of the Project is not about technical viability or effectiveness, but instead is based more on his view about what the impact the Project would have on potential consolidation if it was approved. Tr. I at 97-101.

Jane Arnett, Utility Manager for Charles Town, stated that Charles Town intervened in this case because of concern about the ability of the District to pay for sewage treatment. Charles Town Ex. JA-D at 3, Tr. II at 72. Charles Town is not opposed to the Application and supported the Project as early as June, 2014. Tr. II at 71. Although Ms. Arnett stated that Charles Town does not oppose the Project, Charles Town and Ranson have been in discussions about a plan to acquire the District's assets in order to unify sewer services. The Cities adopted resolutions in September 2016 that identified acquisition as a viable option to unify sewer services among the three utilities. The

resolutions were submitted to the Jefferson County Commission (County Commission), and the County Commission subsequently held workshops regarding this matter. Tr. II at 62. Ms. Arnett expressed concern about the ability to acquire the District's assets and equalize the District's rates with Charles Town's rates in a reasonable time if the added debt proposed to finance the Project is approved. Charles Town Ex. JA-D at 6.

Ms. Arnett, while optimistic about moving forward with an acquisition plan to acquire the District assets, is less optimistic about a consolidation or merger plan among the three utilities (which she acknowledged could be a challenge). Ms. Arnett emphasized that the success of an acquisition plan depends on not increasing the Cities' rates, at least not in the near term. She also stated that a quick financial analysis had been undertaken to look at the viability of an acquisition and to provide information to politicians in Jefferson County. She believes that acquisition is a "reasonable option," but does not believe there is any consensus among the politicians to move forward in any specific manner. Tr. II at 73-76, 91, 93-94, 98.

Andrew Blake, City Manager for Ranson, testified for Ranson about issues and concerns that Ranson has with the Project. Ranson initially supported the Project and negotiated the 2015 Transportation Agreement filed with the District's Application.[10] Ranson Ex. APB-D at 3 and District Application. Ranson now opposes the Project because upgrades to the Flowing Springs Pump Station have been removed from the District Project. Mr. Blake testified that without those upgrades to the Flowing Springs Pump Station, he is concerned that increasing flows from the Project will limit the ability of Ranson to support customer growth in its service area. Tr. II at 109-110, 135, 138. According to Mr. Blake, Ranson will have to rely on the District to make upgrades to the Flowing Springs Pump Station. Mr. Blake asserted that the Project sustains disorganized and inefficient delivery of sewer service within its urban growth boundaries, is inconsistent with the County's Envision 2035 Comprehensive Plan and is not in the best interest of the Ranson ratepayers. Ranson Ex. APB-D at 4-5.

Mr. Blake testified that Ranson passed a resolution to be presented to the County Commission to reorganize sewer service within its urban growth boundaries. The resolution, attached to his pre-filed testimony, calls for the establishment of an Ad Hoc Study Commission to report to the County Commission in no more than twelve months about the recommended delivery of public wastewater service. Id. at 4. He also said that in his opinion adding another $7.1 million of debt would make consolidation more difficult because it will require a rate increase for the ratepayers of the Cities. Tr. II at 111-112.

---

[10] As noted above in the Procedural History attached as Appendix B, Ranson stated that it desired to withdraw from the 2015 Transportation Agreement in its Petition to Intervene filed on June 24, 2016. In the Petition to Intervene Ranson states that certain assumptions have changed or have been clarified since the 2015 Transportation Agreement was filed that cause Ranson to believe the 2015 Agreement is no longer in the best interest of the City without specifying what exactly had been changed or clarified.

11

Ms. Milliron opposes the Project, arguing her position that the cost of future growth should not be borne by current ratepayers.[11] Milliron Ex. JM-D at 2-3. Ms. Milliron testified that instead of moving forward with the Project, the District should rebuild the pump stations and install check valves to prevent back-ups. Id. at 17, 31. Although Ms. Milliron is an articulate spokesperson for her position, she has no engineering background or training.[12] In her post-hearing brief, Ms. Milliron asserts that the pump stations that are to be decommissioned by the Project can continue to operate effectively by performing ongoing routine maintenance and by correcting infiltration and inflow problems. Ms. Milliron argued that, in her opinion (i) there have been no reported health concerns, (ii) there have been no benefits from the use of Bioxide, (iii) the Ranson withdrawal from the 2015 Agreement creates a major change in Project scope, (iv) alternatives to the proposed Project were not explored, (v) the Project unnecessarily replaces the current collection mains in the Breckenridge Subdivision, and (vi) the District should use mainline extension agreements to install facilities to provide service to new developments. Ms. Milliron concluded her arguments by pointing out that the County Commission was scheduled to meet to consider potential consolidation options on February 16, 2017. Milliron Post-Hearing Brief at 1-3.

## D. Response to Opposition to Project

District Witness Lawton testified that the District filed its Application in response to a Ranson request to develop and execute plans immediately to alleviate the capacity issues caused by the District N. Rt. 9 System flows into the North Mildred Street 10-inch line and other District flows currently entering the Ranson Flowing Springs Pump Station. District Ex. SL-R at 2, Ex. SLR-1 (Ranson letter dated June 27, 2014). According to Ms. Lawton, the District received another letter from Ranson dated October 3, 2014, stating Ranson's offer for the District's continued use of the Flowing Springs Pump Station to help lower the cost of the Project. Ms. Lawton said that the second letter from Ranson led to the drafting of the 2015 Agreement. District Ex. SL-R, Ex. SLR-2. She also said that the claim by Ranson that it withdrew from the 2015 Agreement because the District removed the upgrades to the Flowing Springs Pump Station is not correct. She said that the DEP required elimination of the proposed upgrades to the Flowing Springs Pump Station because Ranson first withdrew from the 2015 Agreement. District Ex. SL-R at 3.

District witness Hypes countered the assertions of the Intervenors that there would be no harm to the District if the Project was delayed in order to explore consolidation of the three utilities. Mr. Hypes disagreed with the claim that there is no immediate need for the Project. He explained that Dunn Engineers has been working with the District for three years and has examined its collection system, including pump stations, on a regular

---

[11] Although we have approved CIFs for purposes of easing the burden on customers, we disagree with Ms. Milliron's position that only future customers and future growth are responsible for system improvements. Obviously, all customers add to the demand on the system and cause the need for improvements.

[12] Tr. II at 155-158.

basis. According to Mr. Hype's assessment, several District pump stations (i) are obsolete and fail on a regular basis, (ii) are in poor structural condition, (iii) are subject to prolonged outages because repair parts are no longer made for these older stations, and (iv) are costly to repair because specialized fittings and controls must be ordered or manufactured.

Mr. Hypes agreed with Ms. Lawton about the condition of the pump stations and stated that they are going to start to fail catastrophically at some point in the near future. Tr. I at 263-264. When questioned about the continued availability of approved Project funding, Mr. Hypes stated that if the Project was delayed it is "possible" that USDA funding would continue to be available, but he had concerns about the continued availability of the DEP funding because of a high demand for the DEPSRF funding by other wastewater utilities that have projects that are ready to proceed. Id. at 282.

Mr. Hypes strongly disagreed with Mr. Fowler that the Project should be denied or delayed in order to explore consolidation. Mr. Hypes argued that there are urgent capacity issues with District-owned facilities that, if not addressed or if delayed unnecessarily, will jeopardize the District's ability to serve its customers. According to Mr. Hypes, delaying the elimination of six pump stations and construction of the Halltown pump station until the existing pump stations fail completely is contrary to DEP and Commission regulations and the District NPDES permit and is inconsistent with the interests of consolidation.

Mr. Hypes also contended that the District N. Rt. 9 System flows contribute to capacity issues and manhole overflows present on the Old Town Ranson system and that the Project addresses the concerns of Ranson as relayed to the District in the letter from Ranson dated June 27, 2014. Mr. Hypes disagreed with Mr. Fowler that the available capacity at the Flowing Springs Pump Station is a factor that argues against the Project. The available capacity at the Flowing Springs Pump Station is not a relevant issue driving the need for the Project inasmuch as Ranson has withdrawn from the 2015 Transportation Agreement. District Ex. FH-R at 3-4.

Mr. Hypes disagreed with Mr. Blake that the Project was inconsistent with the Jefferson County 2035 Comprehensive Plan and would not alleviate capacity issues in the Old Town Ranson system. Mr. Hypes pointed out that Mr. Blake's position that the Flowing Springs Pump Station upgrades are necessary to eliminate the Old Town Ranson capacity issues is directly contrary to the position of Mr. Fowler that no upgrade to the Flowing Springs Pump Station is needed at this time. Mr. Hypes asserted that Mr. Blake's claim that the Project will not alleviate capacity issues in the Old Town Ranson system is incorrect because the Project will divert most of the District N. Rt. 9 System flows to the proposed Flowing Springs interceptor, thereby bypassing the Old Town Ranson sewer lines. Id. at 4-5.

Mr. Morgan also disagreed with Mr. Fowler about the need for the Project and the likely negative impact on District customers from delay of the Project in order to explore consolidation options. According to Mr. Morgan, the 2.75 percent interest rate approved for the USDA RD loan will not be guaranteed if the Project is delayed. USDA RD has announced its intentions to increase the loan rate on future loans. If the Project is delayed and the District is able to re-secure USDA RD funding in the future, an increase in the interest rate and construction costs are likely. District Ex. WDM-R at 6-7. Mr. Morgan agreed with Mr. Fowler that the District system and the Cities systems are in some areas close to one another, but the reasons for that are rooted in the Cities past reluctance to extend service beyond municipal boundaries. According to Mr. Morgan, the proximity of the service areas is not a factor in whether the Project should be approved and will not change or impact that situation in any way. Id. at 2.

Mr. Morgan also disagreed with Mr. Fowler and the Intervenors that issuance of debt for the Project would complicate or make it impossible to effect a future acquisition, consolidation or merger. Like Mr. Hypes, Mr. Morgan disagreed with Mr. Fowler that the presence of additional capacity at the Flowing Springs Pump Station is a relevant factor supporting a delay of the Project. Id. at 3-6.

In response to concerns about septicity issues expressed by Charles Town witness Cole, Mr. Morgan asserted that the proposed Halltown Pump Station is designed to feed Bioxide in order to prevent or remove hydrogen sulfide that could build up there and in the force main discharge into the Flowing Springs Pump Station. Mr. Morgan claimed that the treatment with Bioxide would address the concern with the septicity of District flows entering the CTWWTP. Mr. Morgan testified that the Halltown Pump Station will utilize website software and monitoring controls to limit the Bioxide feed rates and prevent over treatment that could cause excess nitrates in the flow to the CTWWTP. Id. at 7-10.

Mr. Morgan also testified about concerns raised in the testimony of Ms. Milliron. Mr. Morgan disagreed with Ms. Milliron's characterization of the Project as focused on additional capacity to support developer growth. He said the Project is supported by the need to (i) replace and upgrade out-dated pump stations that are costly to repair and maintain, (ii) divert District N. Rt. 9 System flows from the Old Town Ranson system, and (iii) eliminate capacity constraints in the Flowing Springs Basin System. Mr. Morgan testified that the Project is fully supported by these needs, but said there are additional positive benefits from the Project regarding near-term growth. He testified that all those benefits will be lost if the Project is delayed. Id. 11-12.

## IV. DISCUSSION

This case presents conflicting positions and procedural challenges that have led to a robust record. One issue raised by opponents of the Project is the impact the Project might have on consolidation efforts. Consolidation of utilities can create increased

14

efficiencies by eliminating duplicate functions and savings from the economies of scope and scale driven by a larger customer base. Acquisition, consolidation or merger can also sometimes positively impact customer rates, a benefit that the Commission wholeheartedly supports. The Commission encourages consolidation of utilities where possible and encourages the Cities and District to continue considering the potential for consolidation in Jefferson County.

Discussion about consolidation of the three sewer utilities, however, was raised only after the District had filed its Application to construct a Project first identified in 2011 in response to denial of the Flowing Springs Plant. Case No. 09-0347-PSD-PC-CN, Order dated August 12, 2011. After issuance of that Order, the District has complied with requests and conditions to undertake a strategic plan that would identify and prioritize projects that are needed to continue reliable service to existing and future customers as required of regulated utilities. The Commission Order issued on November 25, 2014, in Case No. 12-0513-PSD-42T-PC (Reopened), required the District to file a wastewater improvement strategic plan before any further certificate filings could be filed with the Commission. The District filed the 2015 Strategic Plan prepared by Dunn Engineers, Inc. on August 13, 2015. The 2015 Strategic Plan included the descriptions and cost estimates for the Northern Rt. 9/Halltown Pump Station Project that is the subject of this proceeding.

While the Commission encourages potential consolidation in appropriate cases, the Commission will rely on the record to determine the necessity for the Project in meeting the needs of existing and future customers, the convenience of the Project as being in the public interest, and the viability of alternatives proposed to the District Project. The record is long on the intent of the Cities to explore acquisition, consolidation or merger, but short on evidence that some form of acquisition, consolidation or merger will be achieved in the near future. In spite of the lack of evidence of a viable consolidation alternative, Staff and the Intervenors requested that the CCN be denied, or the Project be delayed for twelve months, in order to facilitate a plan for acquisition, consolidation or merger of the District's assets. At this point the Intervenors have not provided the Commission information on what that plan will be or how that plan will address the service issues addressed by the Project.

Ranson testified about its plan to submit a resolution to the County Commission to create an Ad Hoc committee to explore consolidation alternatives that may result in a recommendation to the County Commission within twelve months.[13] Ranson raised further objection to the Project because upgrades to the Flowing Springs Pump Station were removed from the Project design. The record reflects, however, that it was Ranson's own action (the withdrawal from the 2015 Agreement) that caused those upgrades to the Flowing Springs Pump Station to be removed from the original District Project.[14] Ranson argued that the focus should be on the interest of the public in the

---

[13] Ranson Ex. APB-D at 4.

[14] District Ex. SL-R at 3.

15

entire watershed and the services provided by the three utilities has been developed haphazardly and largely by happenstance.[15]

The District countered that the development of its collection system has been driven by the reluctance of the Cities in the past to extend service beyond the municipal boundaries.[16] The District has historically worked cooperatively with the Cities through the joint use of treatment plant capacity, collection system capacity and various other services to avoid duplication of services. Some form of acquisition, consolidation or merger may prove beneficial to the customers of the District and the Cities, but at this juncture and on this record, the Commission cannot ignore the service needs of the District as presented and supported by the District in its Application.

Charles Town claimed an acquisition of the District's facilities is a better alternative for the City, given Charles Town's existing bond requirements.[17] Ms. Arnett testified that in coordination with Ranson, a "high level" (meaning not detailed or fully documented) financial analysis was developed to assist in determining the viability of an acquisition. The financial analysis was provided to the Commission as Commission Post-Hearing Ex. 1. Charles Town argued that the parties are now on the cusp of some form of consolidation, but the Charles Town Utility Manager indicates that there is no consensus as to how it will be achieved.[18] Charles Town argued for the Commission to fashion an order that delays the Project and allows time to explore consolidation alternatives.[19] Charles Town, however, provides no timeframe or substantive plan for consolidation nor does it suggest how the District can retain the current financing package if such a delay is granted. Charles Town does not address the impact on District rates if the Project has to be addressed at a later date.

The statutory deadline for Commission decision in this proceeding is March 23, 2017. That statute requires the Commission to act on certificate filings. The Commission cannot simply delay the Project, absent a motion by the District to toll the statutory deadline. The Commission will not deny a certificate based on the request for delay proposed by the Staff and the Intervenors when the District has sufficient evidence for the need for the Project in order to maintain reliable service to current and future customers.

Staff takes no issue with the scope and design of the Project. Staff argued that the Project is not needed at this time because (i) there are no urgent capacity problems, (ii) the District has not shown that growth is a material factor driving the Project, (iii) the Project is not necessary to serve new customers, and (iv) the Project has not been shown to represent orderly and efficient development of facilities and service. Staff's Initial

---

[15] Ranson Initial Brief at 3.

[16] District Ex. WDM-R at 2.

[17] Charles Town Initial Brief at 3.

[18] Id., and Tr. II at 75.

[19] Charles Town Initial Brief at 4.

Brief at 1. At the hearing, however, Mr. Fowler agreed that the Project does not directly impact areas served by Ranson or Charles Town and is basically a Project to repair and replace District facilities. Mr. Fowler agreed the construction contemplated by the Project is the responsibility of the District and no other utility. Tr. II at 57-58. Mr. Fowler also agreed that the need for the Project is not based on capacity at the Flowing Springs Pump Station, even though he had in part based his recommendation to deny the CCN on the excess capacity at the Flowing Springs Pump Station. Id. at 63.

As addressed in the 2017 Rate Order issued today, the Commission relied heavily on Staff testimony about historical and projected customer growth rates and the District capacity constraints at several points in its collection system to support its decision to authorize an increase in the District CIF and to establish a CAF. 2017 Rate Order at 17-20. In fact, Staff concluded in the 42R Case that several components of the District's collection system are operating at, or above capacity, and the system as a whole has no reserve capacity.

The evidence indicates that the District did not primarily support the need for the Project based on customer growth projections; instead, the District argued that the Project would (i) replace pump stations that have come to the end of their useful life and are costly to repair, (ii) replace the Breckenridge Pump Station that is at capacity and causing back-up into customer homes, and (iii) divert N. Rt. 9 System flow from the Old Town Ranson system to alleviate capacity issues in that area as requested by Ranson. Each District witness stressed these reasons for the Project. Mr. Morgan did indicate that there would be a positive side benefit from the Project in supporting near-term term growth, but that was not the primary reason for the Project. District Ex. WDM-R at 12, Tr. I at 234.

The Commission agrees with the District that providing service to future customers is not the primary purpose of the Project or that a demonstration of future customer growth is a criterion that must be demonstrated in order to obtain a certificate that primarily involves replacement of old and inadequate plant. The Commission disagrees with Staff that the lack of a District showing that future customer growth is a driver of the Project is a reason to deny the CCN. The Commission finds the District has provided more than sufficient evidence that capacity issues at the Breckenridge Pump Station and in the Old Town Ranson system support the need for the Project.

Ms. Milliron advocates maintaining the status quo until other projects come along. Ms. Milliron's argument regarding the pump stations is counter to the opinions of those that are most familiar with the operations of the pump stations, the District Manager and its engineers, and the Staff engineer. If Ms. Milliron's position was accepted, the District would be required to continue to operating pump stations that have reliability issues and are difficult to repair because of a lack of parts.

Mr. Hypes points out that rebuilding the pump stations would cost millions of dollars and take months to complete without providing any transmission capacity to support future growth. The District would still be faced with pump station maintenance. At best, those types of repairs would kick the can down the road a few years. In the end, the District ratepayers may pay even more when system upgrades are included in the Project to provide a more reliable and efficient gravity system. Tr. I at 284. It would be imprudent to continue the piecemeal repair approach advocated by Ms. Milliron until another round of planning, design, review and approval takes place that could result in an even more expensive project.

The Commission will not accept Ms. Milliron's argument that the Project is substantially dependent upon approval of the 2015 Agreement between Ranson and the District. The Project has been in planning since at least 2011, was addressed in the 2015 Strategic Plan, and is before the Commission. Although the Ranson request to divert flows from the Old Town Ranson may have motivated the District to begin implementation of the Project, the Project is not dependent on upgrades to the Flowing Springs Pump Station that were removed from the Project because Ranson ultimately decided to withdraw from the 2015 Agreement. District Ex. FH-R at 2. The evidence supports that the capacity available to the District through the 2008 Transportation Agreement is more than sufficient to support the District flows from the proposed Project now that Charles Town has diverted flows that previously passed through the Flowing Springs Pump Station.

The issue raised by Ms. Milliron about a "bottleneck" at the Breckenridge 8-inch force main was addressed by Mr. Hypes who explained how reducers are used. Tr. I at 259. Keeping that line at its current size will avoid additional cost for this Project. Mr. Hypes explained that an upgrade of the 8-inch force main beginning near Breckenridge was not required to meet the existing flows after completion of the Project. Mr. Hypes did indicate that 8-inch main may need to be up-sized in the future in the presence of future customer growth, but the CIFs and CAFs, if approved in the 42R case, should offset a portion of the cost to upgrade that line as growth occurs.

Ms. Milliron expressed concern that developers contribute to the cost to provide them service. The issue of future growth was reviewed by the Commission in detail in the 42R case. The Commission agrees with Ms. Milliron that when substantial customer growth occurs, the developers responsible for that growth should provide a reasonable, cost-based contribution to help meet a portion of the cost to serve them. The Commission approved an increased CIF and approved a CAF in the 2017 Rate Order issued today in the 42R Case. As explained in the 2017 Rate Order issued today, the CIF and CAF contributions, along with the continuation of Main Extension Agreements where appropriate, will assure that the cost of future growth is being adequately supported by both existing and future customers of the District.

The rates approved in the 42R Case include both Step 1 and Step 2 rates. The Step 1 rates authorized in the 42R Case provide a 14.01 percent increase over rates in effect prior to the filing of the 42R case, and include a $202,317 rate increment to fund the cash working capital reserve required by SB234.[20] The Step 1 rates are effective through August 15, 2017. The Step 2 rates become effective on and after August 16, 2017, and eliminate the cash working capital rate increment included in the Step 1 rates. The Step 2 rates result in an increase of $161,871, or 6.23 percent, over the rates in effect prior to filing of the 42R Case, but decrease the Step 1 rates by $202,317, or 6.83 percent.

The Post-Project rates being recommended by the District in this case would go into effect upon substantial completion of the Project, currently scheduled for March 2018. The Post-Project rates authorized by this Order would replace the Step 2 rates described above, upon substantial completion of the Project.

Mr. Chuck Young, a Certified Public Accountant with the firm of Cox Hollida & Professionals PLLC appeared as the accountant for the District and sponsored the Rule 42 Exhibit and proposed Post-Project rates. District Ex. CY-D, Ex. CYD-1. Mr. Young presented rebuttal testimony that provided a revised cash flow analysis and revised Post-Project rates that reflected the impact of the January 17, 2017 DEP final funding commitment on the Post-Project rates. The impact of the final DEP funding commitment letter on the District's cash requirements resulted in a reduction of the proposed Post-Project rates of $13,940, or 0.22 percent. District Ex. CY-R at 4-5; Ex. CYR-1 and CYR-2. Mr. Young confirmed that the cash working capital increment used to calculate Step 1 rates in the 42R case is not included in the Post-Project rates. District Ex. CY-D at 4.

Pamela D. Latocha, Staff Utilities Analyst, presented direct testimony recommending the CCN be denied because the District had not provided proof of financing. Staff Ex. PDL-D at 8. Because Staff did not recommend approval of the Project, Staff did not present a Post-Project rate recommendation. Id. at 9. Ms. Latocha acknowledged at the hearing that the DEP letter of assurance satisfied her concerns about financing. Tr. II at 185.

The District was the only party that provided a Post-Project rate recommendation in this proceeding. The Commission has reviewed the Post-Project rates proposed by the District based on the Rule 42 Accounting Exhibit prepared by Mr. Young, including adjustments to the per book numbers to reflect changes in revenues, expenses and debt service payments related to the Project. District Ex. CY-D, Ex. CYD-1. The Commission has also reviewed the amended rates provided in the rebuttal testimony of

---

[20] Subsequent to filing the 42R Case, the District requested an increase in rates in order to recover an increase in treatment costs from Charles Town. On June 23, 2016, the Commission, in Case No. 16-0411-PSD-30B, authorized an interim increase of $0.38 per thousand gallons (30B Rate Increment) over the rates included in the 42R Case. The Step 1 and Step 2 rates authorized today in the 42R Case include the 30B Rate Increment, as do the Post-Project rates authorized in this case.

Mr. Young. District Ex. CY-R, Ex. CYR-1 and CYR-2. The Post-Project rates proposed by the District will be approved as shown in Appendix A. The Post-Project rates will become effective on and after the date the District files a Certificate of Substantial Completion of the Project with the Commission.

The Post-Project rates authorized by this Order increase the Step 2 rates approved in the 42R Case, by approximately $194,000 or 7.1 percent. The Post-Project rates will, however, be approximately 0.3 percent below the Step 1 rates authorized today in the 42R Case.

On March 9, 2017, Ms. Milliron filed a Memo Regarding Ownership of Mildred Street Line (Milliron Memo). On March 15, 2017, the District filed a Motion to Strike the Milliron Memo. The record in this case closed at the end of the evidentiary hearing on February 3, 2017. The Commission will not consider the Milliron Memo as part of the record in this case.

The evidence presented about a possible consolidation in the future is not an adequate or viable alternative to the Project proposed by the District. The Intervenors do not adequately address how, when, or if, the District service issues driving the need for the Project will be addressed in a consolidation plan. The Commission agrees with Mr. Fowler's response to the question about what happens if the Commission denies the Project. According to Mr. Fowler, if the consolidation efforts fail after twelve months, we will be right back where we are today, looking at a Project to address the District's obvious need to upgrade its collection system. As stated by Mr. Morgan, in the meantime, the District will be required to spend money on a band-aid approach to operating the existing, aging system. If that occurs, the rates for the District will need to be even higher than the rates proposed in this proceeding. Tr. I at 173.

The Commission is not persuaded by Cities' claim that approval of the Project will potentially be a death blow to consolidation efforts. The Commission recognizes that acquisitions, consolidations or mergers of utility systems are difficult. The bonds to be issued by the District to finance the Project are public sector debt. In most instances, while bondholder consent would be required for such a transaction, as long as the parties are public bodies and financially viable, there is typically little difficulty in obtaining that consent or for assumption of that debt by the combined or merged entity. The Commission would not expect the new District bonds to provide a major obstacle to an acquisition, consolidation or merger. Obviously an examination of the terms and conditions of that debt will be required. The Cities also claimed the increased Post-Project rates would provide a bigger obstacle to acquisition, consolidation or merger plans. The Commission agrees that rate differentials can be an obstacle to potential acquisition, consolidation or merger plans. The Step 1 rates approved today in the 42R Case, however, are actually higher than the Post-Project rates authorized in this case. The Post-Project rates authorized in this case do not significantly change the rate

20

disparity issues between the Cities and the District that exists upon approval of the rates in the 42R Case today.

Based on the testimony of the engineers regarding the general condition of the District's system, the service issues to be corrected by the Project cannot be put off for an extended period of time without bringing into play the real possibility of failures in the District system. The Commission declines to take that risk based on a consolidation plan that is yet undefined and will likely take several additional years to complete.

The Commission cannot ignore the testimony of the people most familiar with the District operation that the District collection system is in danger of catastrophic failure in its current condition. The testimony regarding the age and condition of the pump stations and the unavailability of parts gives credence to this assertion. The Project provides for a reconfiguration of the District system that will replace force mains with gravity lines and eliminate numerous aging pump stations that are difficult and expensive to maintain and are having reliability issues. The District's flows from its N. Rt. 9 system use 86 percent of the capacity of Ranson's Old Town System. The Project will divert most of this flow away from the Old Town Ranson system relieving the potential for overflows in that area. The Breckenridge pump station, one of the most problematic pump stations in the District system, will be decommissioned.

The District has met its burden that the Project is needed and serves the general public convenience. The evidence in this case adequately supports the need for the Project. The Commission, therefore, authorizes the District to proceed with construction of the Project. The Post-project Rates shown in Appendix A are just and reasonable, cost based, and provide the District adequate revenue to support its cost of service, including the additional debt service payments related to the Project.

## V. FINDINGS OF FACT

1. The Project consists of (i) construction of a 15-inch gravity interceptor from the N. Rt. 9 system near Pump Station 1-10 that will divert flows currently going into Ranson's Old Town System, (ii) elimination of six pump stations, (iii) construction of a new Halltown pump station, (iv) construction of a 24-inch gravity interceptor from the site of the Breckenridge pump station to the new Halltown Pump Station, and (v) construction of a new 12-inch force main from the Halltown Pump Station to the current site of the Breckenridge pump station. District Ex. WDM-D at 3-5, 9.

2. The Project will allow retirement of the 6-inch force main from the District's pump station 1-10 to the tie-in with the Ranson Old Town Collection System at North Mildred Street. District Ex. WDM-D at 4-5, 9.

21

3. All issues raised by the DEP have been addressed and the Project has received DEP approval. Tr. I at 100-101.

4. Funding for the Project consists of (i) a $3,575,000 USDA RD loan at a 2.5 percent interest rate over 40 years. District Ex. WDM-D, Ex. WDM-4, and (ii) a DEPSRF loan of $2,844,984 at .25 percent interest, and a .25 percent administrative fee for a term up to 40 years, and debt forgiveness in the amount of $500,000. January 17, 2017 DEP assurance letter.

5. The Project will divert the District's N. Rt. 9 System flows from the Old Town Ranson system 10-inch line at North Mildred Street as requested by Ranson. District Ex. SL-R at 2; Ex. SLR-1; Ex. SLR-2.

6. Manhole overflows have occurred on the Old Town Ranson system. District Ex. WDM-D at 9.

7. The original Project plans included upgrades to the Flowing Springs Pump Station. District Application.

8. The revised Project plans eliminate the upgrades to the Flowing Springs Pump Station because Ranson withdrew from the 2015 Transportation Agreement. District Ex. WDM-D at 6-7; District Ex. SL-R at 3.

9. Overflows at the Breckenridge pump station have caused back-ups of sewage on more than one occasion. District Ex. SL-D at 9.

10. The Breckenridge Pump Station was intended to be a temporary pump station pending construction of the proposed Flowing Springs Plant and was not designed to accommodate current peak flow levels. District Ex. SL-D at 9; District Ex. WDM-D at 5.

11. Gravity sewer lines are not as prone to septicity as old and aging pump stations. Fowler Tr. I at 86.

12. The Project is primarily a repair and replacement project designed for upgrades to the system needed to address existing capacity and mechanical reliability issues in serving existing customers. District Ex. WDM-R at 11-12; Tr. I at 234, 268-269.

13. The Project was not designed to address future customer growth but will have positive benefits for current customers and near-term growth through the installation of major gravity transmission mains. District Ex. WDM-R at 12.

14. The pump stations in the N. Rt. 9 area are approaching thirty years old, are obsolete and fail on a regular basis. Parts for these stations are not available causing repairs to be expensive because specialized fittings, pumps and controls are required. Tr. I at 175-176, 264.

15. The Project is located in areas where the Cities do not operate and does not duplicate services provided by the Cities. District Ex. WDM-R at 2; Tr. I at 57.

16. Staff has no issue with the scope, technical design or cost of the Project and agrees that alternatives have been appropriately evaluated. Staff Ex. JMF-D at 2; Tr. I at 52-53.

17. Rebuilding the pump stations would cost millions of dollars and take months to complete. Tr. I at 264.

18. The Project is not dependent on upgrades to the Flowing Springs Pump Station. District Ex. WDM-R at 3-4.

19. Ranson voluntarily withdrew the proposed 2015 Transportation Agreement that addressed upgrades to the Flowing Springs Pump Station. District Ex. SL-R at 3-4, Ex. SLR-1 and Ex. SLR-2.

20. Upgrade of the 8-inch force main beginning near Breckenridge is not required to meet the District flows after completion of the Project. Tr. I at 201.

21. Service issues to be corrected by the Project cannot be delayed for an extended period of time without significant risk that failures will occur in the District System. Tr. I at 173, 174, 264; District Ex. SL-D at 3.

22. The 2017 Rate Order authorizes rates that impact the Post-Project rates authorized in this proceeding.

23. The Post-Project rates authorized by this Order will become effective on and after the date the District files a Certificate of Substantial Completion of the Project with the Commission.

## VI. CONCLUSIONS OF LAW

1. The District has met its burden of proof that the Project is needed and serves the general public convenience.

2. Evidence presented about a possible consolidation in the future does not provide an adequate or viable alternative to the Project proposed by the District or

23

adequately address how, when, or if, the District service issues driving the need for the Project will be addressed in a consolidation plan.

3. The Post-Project rates authorized in this case will not significantly change the existing rate disparity between the Cities and the District rates.

4. The evidence presented by the Staff and the Intervenors did not effectively rebut the District's showing by a preponderance of evidence that the Project is needed and in the public interest.

5. The Project is economically feasible because it is fully funded and the District has proposed rates that are reasonable, based on District costs, and are sufficient, but not more than sufficient, to cover the District's Post-Project cost of service.

6. It is appropriate, pursuant to W.Va. Code §24-2-11, to grant the application and to approve the Project.

7. The Post-Project rates recommended by the District and authorized by this Order are reasonable and will be approved. The Post-Project rates shown on Appendix A will become effective on and after the date the District provides the Commission evidence of the Notice of Substantial Completion.

8. The Milliron Memo about ownership of the Mildred Street Line will not be considered as part of the record in this case.

## VII. ORDER

IT IS THEREFORE ORDERED that the application of the Jefferson County Public Service District for a Certificate of Convenience and Necessity to construct improvements and upgrades to its wastewater collection and transmission system and to implement a Post-Project rate increase is granted by this Order.

IT IS FURTHER ORDERED that the District file a copy of its NPDES Permit for the Project prior to beginning construction.

IT IS FURTHER ORDERED that the District promptly file a copy of the engineer's certificate tabulation of bids for all contracts associated with the Project.

IT IS FURTHER ORDERED that the District promptly file a copy of the Certificate of Substantial Completion for all contracts associated with the Project.

IT IS FURTHER ORDERED that the rates and charges attached to this Order as Appendix A are approved for use by the District upon substantial completion of the Project.

24

IT IS FURTHER ORDERED that if there are any significant changes in the plans or scope of the Project, the District must seek Commission approval. However, if there are changes in the costs or financing of the Project that will not impact the Project-related rates, the District need not seek Commission approval for the changes in costs or financing, but shall file an affidavit executed by its certified public accountant detailing the changes and verifying that post-Project rates are not affected.

IT IS FURTHER ORDERED that on entry of this Order, this case is closed and will be removed from the Commission open docket.

IT IS FURTHER ORDERED that the Executive Secretary of the Commission serve a copy of this Order by electronic service on all parties of record who have filed an e-service agreement, and by United States First Class Mail on all parties of record who have not filed an e-service agreement, and on Commission Staff by hand delivery.

A True Copy, Teste,

*Ingrid Ferrell*

Ingrid Ferrell
Executive Secretary

RMA/rm
160616ch.docx

25

### JEFFERSON COUNTY PUBLIC SERVICE DISTRICT (Sewer)
Post-Project Rates
Effective for Service Rendered On or After Approval of
Substantial Completion of the Project Certificated by this Order

APPLICABILITY
 Applicable within the entire territory served.

AVAILABILITY
 Available for general domestic, commercial, and industrial service.

(I) RATES (customers with a metered water supply)
 $17.79 per thousand gallons of metered water usage

(I, C) MINIMUM CHARGE
 No bill will be rendered for less than $44.48 per month.

(I) FLAT RATE CHARGE (Customers with non-metered water supply)
 Equivalent of 4,500 gallons of water usage, $80.06 per month

MULTIPLE OCCUPANCY
 For unmetered trailer parks, the monthly charge for services shall be equal to the number of units multiplied by the unmetered charge provided above.

TRANSPORTATION CHARGE
 A monthly charge of $1,009 per month will be imposed upon the City of Charles Town for reimbursement of fixed debt associated with lift stations needed to transport Charles Town's sewage from the former Sanitary Associates service area. The charge will be imposed until the indebtedness is satisfied. In addition to the monthly charge of $1,009, a transportation charge of $1.65 per thousand gallons shall apply to all flows from the former Sanitary Associates area

DELAYED PAYMENT PENALTY
 The above schedule is net. On all accounts not paid in full when due, ten percent (10%) will be added to the net current amount unpaid. This delayed payment penalty is not interest and is to be collected only once for each bill where it is appropriate.

(I) Indicates increase
(C) Indicates change in text

JEFFERSON COUNTY PUBLIC SERVICE DISTRICT (Sewer)
Post-Project Rates
Effective for Service Rendered On or After Approval of
Substantial Completion of the Project Certificated by this Order

## TAP FEE

The following charge is to be made whenever the utility installs a new tap to serve an applicant.

A tap fee of $250.00 will be charged to customers applying for service outside of a certificate proceeding before the Commission for each new tap to the system.

## DISCONNECT - RECONNECT FEES

Whenever water service has been disconnected for non-payment of sewer bills in conjunction with a water service termination agreement with the City of Charles Town, a disconnection fee of $10.00 shall be charged. Whenever water service has been disconnected for non-payment of sewer bills in conjunction with a water service termination agreement with Jefferson Utilities, Inc., a disconnection fee of $20.00 shall be charged.

Whenever water service, which has been previously disconnected or otherwise withheld for non-payment of a sewer bill in conjunction with a water service termination agreement with the City of Charles Town, is reconnected, a reconnection fee of $10.00 shall be charged. Whenever water service, which has been previously disconnected or otherwise withheld for non-payment of a sewer bill in conjunction with a water service termination agreement with Jefferson Utilities, Inc., is reconnected, a reconnection fee of $20.00 shall be charged.

(I)      ## LEAK ADJUSTMENT INCREMENT

$6.46 per M gallons is to be used when the bill reflects unusual consumption which can be attributed to eligible leakage on customer's side of the meter. This rate shall be applied to all such consumption above the customer's historical usage.

## RETURNED CHECK CHARGE

A service charge equal to the actual bank fee assessed to the sewer utility up to a maximum of $25.00 will be imposed upon any customer whose check for payment of charges is returned by the bank due to insufficient funds.

(I)      Indicates increase

JEFFERSON COUNTY PUBLIC SERVICE DISTRICT (Sewer)
Post-Project Rates
Effective for Service Rendered On or After Approval of
Substantial Completion of the Project Certificated by this Order

## CAPACITY IMPROVEMENT FEE

As used in this section, a "Developer" is defined as "a person, corporation, or entity who is in the business of land and/or commercial or housing development for profit, or a person, corporation, or entity who requests an alternate main line extension that includes the installation of mains by the person, corporation or entity."

As used in this section, a "Previously Developed Tract" is defined as property previously subdivided for commercial or housing development, for profit.

On and after August 13, 2015, Developers and resale customers (in instances of developer connections), and those seeking a new sewer connection for a Previously Developed Tract shall pay to the District a Capacity Improvement Fee (CIF) for connections made to the sewer system of an unserved structure or facility. For Developers and those seeking a new sewer connection for a Previously Developed tract, the CIFs are due as of the date of the entry into the final sewer availability agreement with the Jefferson County Public Service District. For resale customers making developer connections, the CIF is due the month following the date a new customer of the District's resale customer to which the CIF is applicable connects to the facilities of the District's resale customer.

The Capacity Improvement Fee shall be $3,207.00 per equivalent dwelling unit (EDU). Connections for non-residential use shall be paid in accordance with a residential usage equivalent schedule set forth below.

## CAPACITY ASSURANCE FEE

Developers, those seeking to assure capacity for a Previously Developed Tract, and resale customers of the District (in instances of developer connections) may execute a Capacity Assurance Agreement (CAA) and pay a Capacity Assurance Fee (CAF) to the District in the amount of $3,207.00 per EDU. Execution of the CAA and payment of the CAF shall entitle the payee to a reservation of capacity as provided in the CAA.

At such time as the reserved capacity is call upon by the entity paying a CAF, the CAF will be treated by the District as a credit, without interest, against the District's then effective CIF. Subject to this credit, entitles that have been paid a CAF remain responsible for payment of the District's then effective CIF for construction on property indentified in the CAA.

### JEFFERSON COUNTY PUBLIC SERVICE DISTRICT (Sewer)
### RESIDENTIAL USAGE EQUIVALENTS FOR CAPACITY IMPROVEMENT FEE

| UNIT | WATER GALLONS PER DAY | RESIDENTIAL USAGE EQUIVALENT |
|---|---|---|
| Apartments | 150/unit | 1.0/unit |
| Bowling Alleys | 200/alley | 1.33/alley |
| Churches with kitchen | 8/member | 0.05/member |
| Churches w/o kitchen | 2/member | 0.013/member |
| Food Service | 32/seat | 0.213/seat |
| Fast Food Restaurant | 35/seat | 0.23/seat |
| Bar & Cocktail Lounge | 2/patron | 0.013/patron (additive) |
| Tavern-Little or no food | 20/seat | 0.132/per seat |
| Hotel | 120/room | 0.8/per room |
| Industry, sanitary | 15/person/shift | 0.1/person per shift |
| | | |
| **Institutions:** | | |
| Hospital | 250/bed | 1.67/bed |
| Nursing Homes | 150/bed | 1.0/bed |
| Others | 75/person | 0.5/person |
| Office Buildings | 15/person | 0.1/person |
| Laundry Self Service | 250/washer | 1.67washer |
| Mobile Home Park | 150/unit space | 1.0/unit space |
| Motels | 120/room | 0.8/room |
| Retail Stores | 400/toilet room | 2.67/toilet room |
| Residence | 150/residence | 1.0/residence |
| | | |
| **Schools:** | | |
| Day, no cafeteria/showers | 15/pupil | 0.1/pupil |
| Day with cafeteria | 18/pupil | 0.12/pupil |
| Day with cafeteria/showers | 20/pupil | 0.133/pupil |
| Boarding | 75/pupil | 0.5/pupil |
| Service Station | 500/set of pumps | 3.33/set of pumps |
| Shopping Centers | 100 ft. of sales area | 0.12/100ft. of sales area |
| Swimming Pools | 10/swimmer design | 0.067/swimmer design |
| | | |
| **Theaters:** | | |
| Drive In | 4/car space | 0.0247/car space |
| Others | 3/seat | 0.02/seat |
| Warehouse | 15/employee | 0.1/employee |

If a unit does not appear on this schedule, the District shall determine the EDU value of a proposed improvement in consultation with its consulting engineer.

**Jefferson County Public Service District, Case No. 16-0616-PSD-PC-CN**

## PROCEDURAL HISTORY

On May 12, 2016, the District filed the Application for a certificate of convenience and necessity for the Project, petitioned for approval of an inter-utility agreement and Post-Project rates.

On May 25, 2016, Jacquelyn Milliron (Ms. Milliron) filed a Petition to Intervene, Request to Toll the case and Request for hearing in Jefferson County. On the same date, the Charles Town filed a Petition to Intervene.

On June 14, 2016, Staff filed its Initial and Final Joint Staff Memorandum (Initial Staff Memo) alleging deficiencies in the District Application. Staff recommended dismissal of the Application, calling the Application inadequate and premature.

On June 16, 2016, the Commission entered an Order requiring the District to file a substantive response to the June 14, 2016 Initial Staff Memo or a Motion to Toll the case.

On June 24, 2016, Ranson filed a Petition to Intervene and requested to withdraw from an inter-utility transportation agreement with the District.

On June 24, 2016, the District filed a response to the June 14, 2016 Staff Memorandum and a Motion to Toll the case. The District requested that the Commission toll the case for ninety days. The District also requested that the Commission waive the requirement that the District file Form No. 4 of the Commission Rules of Practice and Procedure, 150 C.S.R. 1, the Application for a Certificate of Convenience and Necessity (Form No. 4). The District asserted that it had addressed in its filing all the items identified in Form No. 4.

On July 8, 2016, the Commission entered an Order granting the District request to toll the running of the statutory suspension period in this matter for forty-five days. The purpose of the tolling was "to allow the District time to confer with Staff and make additional or revised filings." Order at 2. This tolling period was in addition to a forty-five day extension based on the receipt of substantial protests. The new deadline, combining the extension and the tolling, was February 6, 2017. In that same Order, the Commission granted the Petitions to Intervene filed by Ranson, Charles Town and Ms. Milliron.

On July 13, 2016, the Commission entered an Order directing the District and Staff to file responses to the June 24, 2016 Ranson filing regarding its withdrawal from the proposed 2015 Agreement. In an Order entered July 21, 2016, the Commission

extended the deadline for those responses to August 12, 2016, in response to a request by the District. In that same Order, the Commission granted the request of Bowles Rice, LLP, to withdraw as counsel for the District because of a conflict of interest raised by the intervention of Ranson in this case.

On September 8, 2016, the Commission ordered the District to file a supplemental report (Supplemental Report) containing a detailed explanation of (i) the extent to which the design of the Project will be affected by Ranson's withdrawal from the 2015 Agreement, (ii) how the Project revision or redesign will affect the process and timeline for funding and other regulatory approvals, and (iii) when the District anticipated the revised Project documents would be sufficiently complete for Commission review of the District Application. The Commission gave Staff and all Intervenors ten days to file responses to the Supplemental Report.

On September 30, 2016, the District filed a motion to extend the tolling of the running of the statutory suspension period (Motion to Extend) for a further forty-five days. On that same date, the District filed its Supplemental Report.

On October 11, 2016, Staff filed its Second Further Final Joint Staff Memorandum (Second Further Staff Memo) responding to the Supplemental Report and recommending dismissal of the case. On that same date, Ms. Milliron filed a response to the Supplemental Report, also recommending dismissal of the case. (Milliron Response).

On October 21, 2016, Charles Town, on behalf of itself and Ranson, filed a response to the Second Further Staff Memo (Charles Town Response). On the same date, Patricia A. Noland filed a Request to Deny Staff Recommendation and to Move Forward with Project. Also on October 21, 2016, the District filed a Response in Opposition to the Further Staff Memo.

On October 31, 2016, Ranson filed a Combined Reply to Ms. Noland's filing and Response to the Second Further Staff Memo.

On November 1, 2016, the Commission granted the motion of the District for a further tolling of the running of the statutory suspension period and required the filing of an agreed-upon procedural schedule.

On November 14, 2016, Ms. Milliron filed a request for a further sixty-day tolling to provide sufficient time to review the "Revised Project." On the same date, the District filed a proposed procedural schedule, noting the request by Ms. Milliron for a further tolling. The District did not agree to a further tolling of this case or file a request of its own for a further tolling. The dates and the location for the evidentiary hearing proposed

in the November 14, 2016 filing by the District could not be accommodated by the Commission.

On November 29, 2016, Ms. Milliron filed a proposed procedural schedule that included the dates of December 5, 2016, and December 7, 2016, proposed by Staff and Ms. Milliron, respectively, for the filing of pre-filed direct testimony by the District. The Staff-proposed due date did not provide any extension of time for that filing beyond the November 14, 2016 proposed schedule, whereas the due date proposed by Ms. Milliron provided two extra days.

On November 30, 2016, the District responded to the proposals of Staff and Ms. Milliron, filing a proposal of its own that included December 12, 2016, as the new date for the filing of both District pre-filed direct testimony and confirmation of DEP funding for the Project. The District indicated that Charles Town and Ranson agreed with the District proposed procedural schedule.

On December 5, 2016, the District filed the direct testimony of Fred Hypes, P.E.; Wayne Morgan, P.E.; Susanne Lawton, District General Manager and Chuck Young, CPA.

On December 7, 2016, the Commission issued a Procedural Order establishing a schedule for the filing of prepared direct and rebuttal testimony for all parties and setting a public comment hearing to be held in Shepherdstown, West Virginia on January 19, 2017, and an evidentiary hearing to be held at the Commission's hearing room in Charleston on February 2 and 3, 2017, as well as a schedule for the submission of simultaneous initial and reply briefs.

On January 3, 2017, Ms. Milliron filed her direct testimony.

On January 5 2017, Charles Town filed the direct testimony of John W. Cole, a Registered Professional Engineer retained by the Charles Town Utility Board (CTUB) and Jane Arnett CTUB Utility Manager; Ranson filed the direct testimony of Andrew Blake, City Manager; and Staff filed the direct testimony of Jonathan E. Fowler, P.E. and Pamela D. Latocha, Utilities Analyst, II. Also on January 5, 2017, Ms. Milliron filed a Request to Treat Staffs Response to Data on CD and a memorandum prepared by James Weimer in Case No. 15-1338-PSD-42R-PC (Weimer Memorandum), as his pre-filed expert testimony in this case. (Milliron Testimony Request).

On January 17, 2017, the District filed a "Motion in Limine and Response in Opposition to Ms. Milliron's Request to Treat Staffs Response to Data on CD and the Weimer Memorandum as Relevant Testimony of Staff Engineer James Weimer" (District

Motion). Also on January 17, 2017, Staff and the District filed a funding commitment letter from the West Virginia Department of Environmental Protection (DEP).

On January 18, 2017, the District filed rebuttal testimony of Fred Hypes, P.E.; Wayne Morgan, P.E.; Susanne Lawton, District General Manager and Chuck Young, CPA and Ms. Milliron filed rebuttal testimony.

On January 19, 2017, Ms. Milliron filed a Response and Objection to Motion in Limine (Response).

On January 19, 2017, the Commission conducted a public comment hearing in Shepherdstown, West Virginia where several witnesses appeared and provided public comment. In addition, District Chairman Appignani provided a written statement in opposition to the Project.

On January 27, 2017, the Commission issued an Order (i) granting the District's Motion in Limine and quashed a subpoena issued to James Weimer, and (ii) denying the request of Ms. Milliron to treat the Staff Data Response of December 21, 2016, and the Weimer Memorandum as his pre-filed testimony in this case.

On February 2 and 3, 2017, the evidentiary hearing was held as scheduled in Charleston.

On February 6, 2017, Charles Town filed a Commission requested post-hearing exhibit, identified as Commission Post-Hearing Ex. 1.

On February 15, 2017, Staff, Charles Town, Ranson and Ms. Milliron filed initial briefs and the District filed a Proposed Order in Lieu of Initial Brief.

On February 21, 2017, the District, Charles Town and Ms. Milliron filed reply briefs.

**No. 17-0384 will be distributed on Friday.**